**HYDE PROPERTIES, Plaintiff,**

v.

**Clyde McCOY, Defendant-Appellant,**

**Will Luck, Trustee, Defendant,**

**United States of America,**
**Defendant-Appellee,**
**and**

**Commissioner of Revenue for Tennessee,**
**George M. Tidwell, Intervenor.**

No. 73–2095.

United States Court of Appeals,
Sixth Circuit.

Nov. 5, 1974.

Order Oct. 24, 1974.

Opinion Nov. 5, 1974.

Ronald Lee Gilman, Farris, Hancock, Gilman, Branan & Lanier, Memphis, Tenn., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Myron C. Baum, Ernest Brown, Crombie J. D. Garrett, David English Carmack, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

W. Michael Richards, Donald A. Malmo, Heiskell, Donelson, Adams, Wil-

liams, & Wall, Memphis, Tenn., Thomas F. Turley, Jr., U. S. Atty., David M. Pack, Atty. Gen. of Tennessee, William B. Hubbard, Asst. Atty. Gen. of Tennessee, Nashville, Tenn., Joseph R. Buchignani, Asst. Atty. Gen., Memphis, Tenn., for defendant-appellee.

Before WEICK, MILLER and LIVELY, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

International House of Pancakes of Tennessee, Inc. (IHPT) was a corporation formed by and owned in equal shares by Clyde McCoy and his two brothers-in-law, Allin Means and Frank Means. The corporation was organized in 1963 for the purpose of franchising pancake houses throughout Tennessee. All three men were officers of the corporation, but the management of the business was conducted by the Means brothers. McCoy contributed most of the original capital investment, but because he traveled a great deal as a musician, his only other contact with the corporation was to attend the directors' meetings.

In addition to its franchising activities, IHPT constructed the Oak Hall Building, an office and commercial structure located in East Memphis. At the same time, the corporation was having difficulty in meeting its financial obligations to various creditors. Specifically, it was delinquent in paying taxes owed both to the state and to the federal government. As these tax delinquencies increased, IHPT decided to sell the Oak Hall Building in an effort to increase the corporation's liquidity. The company began to look for a purchaser in 1968 and finally negotiated a sale to Hyde Properties on June 16, 1969. As part payment, Hyde Properties executed two promissory notes, each for a principal sum of $25,000. Both notes were to mature two years later on June 16, 1971.[1] Two days after the sale, on June 18,

1. One of the notes was subject to an express agreement by IHPT to indemnify Hyde

Properties for the costs incurred in making certain kinds of repairs. Hyde asserted a

1969, IHPT transferred these same two notes to McCoy as a redemption of all of his interest in the business. Subsequently, in October and November of 1969 and in October of 1970, the Internal Revenue Service (IRS) filed notices of tax liens against IHPT.[2] Finally, on June 8, 1971, only a few days before the notes were due, the IRS served a notice of levy upon Hyde Properties. Because of the conflicting claims of the Government and McCoy, Hyde Properties brought this suit in the nature of interpleader, depositing with the court the funds representing its entire obligation on the notes. The United States maintained that the redemption of McCoy's stock with the notes was a fraudulent conveyance as to it as a tax lien creditor. McCoy contended that the transfer was a legal redemption of the stock by a solvent corporation.

On the ground that this was an equitable proceeding, the Government moved to strike the jury demand made by McCoy. This motion was overruled by the district court, and the case was submitted to the jury on interrogatories.[3] In essence, the jury determined that IHPT was solvent at the time of the transfer and that the conveyance was not a fraudulent one. Upon motion, the district court granted a judgment notwithstanding the verdict (j.n.o.v.) and a conditional new trial in favor of the Government. On the basis of its own independent consideration of the evidence, it directed that the fund, less var-

ious expenses and a setoff, be awarded to the United States as partial satisfaction of its tax liens. From this ruling McCoy appealed.

The threshold issue in this case is whether McCoy was entitled to jury trial under the Seventh Amendment. This question must be first answered because it bears directly upon the district court's rulings subsequent to the verdict.

■ In Farmers-Peoples Bank v. United States, 477 F.2d 752 (6th Cir. 1973), this Court dealt with the right to jury trial in civil lawsuits in federal court. There we noted that this right adhered not only to traditional common law proceedings but also to other cases requiring the ascertainment and determination of legal rights. *Id.* at 756. Suits involving solely equitable rights and remedies are outside the ambit of the Amendment. Yet, the precise demarcation between legal and equitable claims is frequently difficult to discern. *Id.* at 756. Because of the nature of the present case, we must analyze any claim to a right to jury as it applies both to interpleader suits and to fraudulent conveyance actions.

■ Although interpleader traces its origins to the common law courts, it soon became the exclusive province of the English chancellors, and today it is regarded as a traditional remedy of equity. 7 C. Wright & A. Miller, Federal Practice and Procedure, § 1701, at 351–

---

breach of the contract and was awarded a setoff by the district court of $3,008.45. The court considered the question of the breach of contract to be a legal issue and one that was properly triable before a jury. Neither this characterization nor the actual setoff are challenged on appeal. In effect, the trial judge accepted the jury's verdict on the legal issue but rejected its advisory opinion concerning the fraudulent conveyance. This procedure for dealing with legal and equitable claims presented in the same case is consistent with recent Supreme Court decisions. *See* Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) ; Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

2. The State of Tennessee intervened in this action, but it was determined that the United States' tax claims had priority. The State did not appeal from this determination.

3. Later in his opinion, the trial judge reconsidered the issue of the right to jury trial of the fraudulent conveyance issue under the Seventh Amendment. He concluded that there was no such right because of the equitable nature of interpleader and fraudulent conveyance actions. As a result, while he did not in terms set aside the jury's responses to the interrogatories, he did grant the Government's motion for j. n. o. v.

52 (1972). In a case decided before the merger in the federal system of law and equity, the Supreme Court indicated that the Seventh Amendment did not provide for a right to jury in interpleader actions. Liberty Oil Co. v. Condon Nat'l. Bank, 260 U.S. 235, 244, 43 S.Ct. 118, 67 L.Ed. 232 (1922). This view prevailed even after merger, but today its support has eroded because "numerous courts and commentators have now come to the conclusion that the right to a jury should not turn on how the parties happen to be brought into court." Ross v. Bernhard, 396 U.S. 531, 542 n. 15, 90 S.Ct. 733, 740, 24 L.Ed.2d 729 (1970). For the purpose of evaluating this constitutional right, it is important to distinguish between a device used to prosecute a case and the underlying issue to be resolved by the litigation. The historical characterization of the former is no longer determinative of the jury claim. "The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." Ross, 396 U.S. at 538, 90 S.Ct. at 738. Interpleader is analogous to the stockholder derivative action considered in the Ross case. Even though the derivative action was an equitable device, the right to a jury turned on the character of the corporation's cause of action. The same rationale we believe applies to interpleader— an equitable remedy to resolve conflicting claims to a single fund. While the remedy may be considered as traditionally an equitable device, the Seventh Amendment's applicability should depend upon the classification of the controlling issue between the adverse parties.

In this case, the underlying controversy was whether or not there had been a fraudulent conveyance of two promissory notes. To distinguish between legal and equitable claims, this Court has looked to the three factors set forth in the Ross decision—"first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries." Farmers-Peoples Bank, 477 F.2d at 756.

■■ Questions involving fraud cannot be classified from custom as solely legal or solely equitable and, as a result, the nature of the remedy sought becomes considerably more important in resolving the right to jury trial. 5 J. Moore, Federal Practice ¶ 38.20, at 175 (2d ed. 1974). If a fraudulent conveyance action is brought to set aside a transfer, such a remedy is cognizable only in equity. Damsky v. Zavatt, 289 F.2d 46, 53 (2d Cir. 1961); see Senchal v. Carroll, 394 F.2d 797 (10th Cir.), cert. denied, 393 U.S. 979, 89 S.Ct. 448, 21 L.Ed.2d 440 (1968). However, where the legal relief is adequate, it is an action at law and the right to jury adheres. See 9 Wright & Miller, § 2311, at 52–53 (1972).

■■ The second element takes into account the various types of relief available. A creditor under Tennessee law has two possible remedies for a fraudulent conveyance—he can have the transfer set aside or annulled, or he can ignore the conveyance and levy an execution upon the property.[4] The first alternative is exclusively within the power of equity. Damsky, 289 F.2d at 53; Baker v. Penecost, 171 Tenn. 529, 534, 106 S.W.2d 220, 222 (1937). The second option is a legal remedy based on the theory that a fraudulent conveyance, though valid between the parties, is void as to creditors. Covington v. Murray, 220 Tenn. 265, 271, 416 S.W.2d 761, 764

4. _T.C.A. 64–317. Remedies of creditor on matured debt._—Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or me-diately from such a purchaser, (a) have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or (b) disregard the conveyance and attach or levy execution upon the property conveyed. See also American Surety Co. v. Conner, 251 N.Y. 1, 166 N.E. 783 (1929).

(1967). Because such a transfer is void, a court of law may grant a creditor either a levy of attachment or execution. *Baker*, 171 Tenn. at 534, 106 S.W.2d at 222 (1937). Although a creditor has a choice of proceeding either at law or in equity, we are of the view that for the purposes of determining a right to jury trial the creditor must proceed at law unless such remedy is inadequate. Without this requirement, it is clear that a creditor could decide to pursue his relief in equity and, thereby, deny to his adversary the right to a jury under the Seventh Amendment. To prevent a party from thus controlling the constitutional rights of his opponent, the legal remedy must be inadequate before the equitable means of redress can be employed. *See* Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).

This case is a hybrid one because the subject matter of the suit is a fund on deposit with the district court while the notes are in the hands of the transferee. The legal remedies of attachment or execution levied against promissory notes would generally be inadequate because of the ease with which these items can be concealed or otherwise placed beyond the reach of the levy.[5] In addition, there is the risk of liability for a wrongful attachment or execution. *See Baker*, 171 Tenn. at 535, 106 S.W.2d at 222 (1937). As the fund had already been deposited with the district court, and as the notes themselves needed to be set aside or cancelled to prevent any future liability, equitable relief was necessary for enforcement of the Government's claim.[6]

At trial the fraudulent conveyance issue depended upon the solvency or insolvency of IHPT at the time of or immediately after the transfer. The determination of this question involved conflicting issues of fact concerning accounting procedures used to list the assets and liabilities of the corporation. In its opinion, the district court acknowledged that "the issues between the parties were both complex and likely to be confusing in light of the underlying facts and circumstances. . . ." We agree with this observation and consequently find as to the third factor that a jury is not especially well-qualified to dispose of such issues and that a non-jury trial of the issues is both more efficient and more likely to produce a just result.

■ In light of the above criteria, we conclude that there is no constitutional right to a jury trial in an interpleader action when the creditor is proceeding against the fund and seeking to annul the conveyance to the transferee. Because no right to jury trial existed, the jury empanelled by the district court was, in effect, an advisory one. *See* Fed.R.Civ.P. 39(c). Since it is within the discretion of the trial court to accept or reject the verdict of an advisory jury, it can by the same token disregard the jury's responses to the interrogatories. *See* Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114, 122 (5th Cir. 1973); Chicago & N. W. Ry. Co. v. Minnesota Transfer Ry. Co., 371 F.2d 129, 130 (8th Cir. 1967).

■ We must, therefore, review the findings of fact and conclusions of law of the district court which constituted the basis for its final judgment for the Government. We may not overturn the trial court's factual determinations unless we find them to be "clearly erroneous." Fed.R.Civ.P. 52(a). As previously stated, the fraudulent conveyance issue turned upon the financial con-

---

5. There is at least some authority in Tennessee that a promissory note is not subject to execution. Moore v. Pillow, 22 Tenn. 437 (1842).

6. It must be remembered that the United States was not attempting to assert any tax liability against McCoy. That issue was exclusively between IHPT and the IRS. The Government's only interest in McCoy was as holder of notes originally due to the tax delinquent corporation.

dition of IHPT at the time of the transfer of the two notes. McCoy's proof of the company's solvency consisted of a balance sheet purportedly reflecting the financial position of the corporation as of March 31, 1969, and the testimony of several persons connected with IHPT. This balance sheet had been prepared by the corporation's bookkeeper, and it indicated that IHPT had a total net worth of slightly over $358,000.00. The Means brothers relied upon the figures in the balance sheet to support their testimony that IHPT was solvent and that the redeemed stock was more valuable than the $50,000 worth of notes. Nevertheless, all of the witnesses who were familiar with the management of the business acknowledged that IHPT lacked cash and, consequently, had difficulty in paying its obligations.

Much of McCoy's proof depended upon the accuracy of the unaudited balance sheet since a number of witnesses used its figures to buttress their opinions of IHPT's solvency. The district court, however, found the balance sheet to be misleading and concluded that the corporation actually had a negative net worth on the date of the sale. This determination was based on evidence that the company understated depreciation, overstated the value of the Oak Hall Building and underestimated its tax liabilities. According to the trial court, these and other inaccuracies caused IHPT to have liabilities in excess of its assets. After carefully reviewing the evidence presented, we cannot say that the district court's findings were clearly erroneous.

Although the district court mentioned several tests for insolvency, it relied upon the criterion set forth in the Uniform Fraudulent Conveyance Act in effect in Tennessee.[7] Because the present case involves an alleged fraudulent transfer, this standard was the proper one to be applied and reference to any other test was unnecessary. Essentially, the statutory provision anticipates a voluntary, open market sale of all of an individual's assets. If the fair market value of the individual's property will not cover his obligations as they fall due, the debtor is insolvent. *See* State ex rel. v. Caldwell, 21 Tenn.App. 396, 111 S.W.2d 377 (1937). At the time of the transfer, IHPT had a negative net worth and, therefore, was insolvent under the statute. As a result, the corporation's stock in the hands of McCoy was virtually worthless. Any exchange of these shares for the well-secured Hyde Property notes would constitute a transfer without fair consideration.[8] Under the Tennessee law, every conveyance made by an insolvent without fair consideration is deemed fraudulent as to creditors regardless of the actual intent of the debtor.[9] This was precisely the situation of IHPT—its transfer of the notes to McCoy was fraudulent because the corporation did not receive a fair consideration for the exchange. The district court was correct in setting aside the

---

7. *T.C.A. 64–309. Test for insolvency.*—A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

8. *T.C.A. 64–311. "Fair consideration" defined.*—Fair consideration is given for property, or obligation, (a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) when such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

9. *T.C.A. 64–312. Conveyances by insolvent without fair consideration declared fraudulent.*—Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

conveyance and in awarding the fund to the United States.

We conclude that the judgment of the district court should be modified to include a provision cancelling the two notes in question. Apparently the notes are presently in the custody of the court, but if not, the district court should direct that they be duly surrendered for cancellation. The judgment of the district court is accordingly modified only to the extent herein indicated and as so modified it is

Affirmed.[10]

AGREED ORDER FOR WITHDRAWAL OF APPEAL AND REMAND IN ACCORDANCE WITH THE AGREEMENT OF THE PARTIES

Upon statements of counsel that the parties to this appeal have reached a settlement of their differences, it is, by consent of the parties, ordered:

1. That the appeal of Clyde McCoy be and the same is hereby dismissed with prejudice.

2. That the Judgment of the District Court for the Western District of Tennessee, Western Division, be and the same is hereby vacated, and this cause is hereby remanded to said Court for the entry of a Consent Order of Settlement in accordance with the agreement of the parties.

3. That a copy of this Order shall be transmitted promptly upon entry to the Clerk of the District Court for the Western District of Tennessee, Western Division, with a conformed copy to be sent to each of the parties hereto.

4. That each of the parties shall bear their own costs of this appeal.

10. After the above opinion had been circulated and approved by the three judges constituting the panel, the Court was notified through the Clerk that the parties were engaged in efforts to settle their differences. At that time, however, the Clerk had not received a proposed order or stipulation formally indicating that a settlement had been finally agreed upon. In the absence of such formal notification the opinion of the Court was forwarded to the printer for publication. Since that time, but before the release of

the printed opinion, the Court has received an agreed order withdrawing the appeal of Clyde McCoy "without prejudice," vacating the judgment of the district court and remanding the action to that court "for the entry of a Consent Order of Settlement in accordance with the agreement of the parties." On this date, October 21, 1974, the said agreed order has been approved by this Court with the result that the settlement of the parties shall be carried out in accordance with its terms.