Edward F. TOWERS, Trustee
in Bankruptcy,

v.

DeWayne F. TITUS, Sr., Mary Teresa Fearon, aka Mary Teresa Kolsch, Frank J. Reno, Thelma R. Reno, Danny Leroy Titus, DeWayne F. Titus, Jr., Orville W. Titus, Suzette Titus, United States of America, Lawrence A. Watson, Wright's Dehydrated Foods, Inc., a California Corporation, Steelgard, Inc., Gordon Nelson, Al Barker, Elmer C. Goodman.

No. C–77–0979 WHO.

United States District Court,
N. D. California.

July 23, 1979.

788

Leroy Rice, Vernon W. Humber, Harvey W. Hoffman, Hoffman, Kelly & Izmirian, San Francisco, Cal., for plaintiff.

DeWayne F. Titus, Sr. in pro. per.

G. William Hunter, U. S. Atty., Jeffrey S. Niesen, Asst. U. S. Atty., Chief, Tax Division, George L. Bevan, Jr., Special Asst. U. S. Atty., San Francisco, Cal., for United States.

Mary Teresa Kolsch, in pro. per.

Thelma & Frank Reno, in pro. per.

Edward R. Fitzsimmons, Richard M. Heimann, Oakland, Cal., for Steelgard, Inc., Orville W. Titus, DeWayne F. Titus, Jr., Danny L. and Suzette Titus.

Gordon Nelson, in pro. per.

Jones & Wilson, West Los Angeles, Cal., for Al Barber.

Dennis J. Tonsing, Lafayette, Cal., for Elmer C. Goodman.

Andrew J. Capestro, Capestro & Lichtenegger, Monterey, Cal., for Lawrence A. Watson.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiff Edward F. Towers, Trustee for the Bankruptcy Estate of DeWayne F. Titus, Sr., brings this plenary action to recover numerous parcels of real estate and other assets allegedly transferred, or held by Titus' nominees, in fraud of the bankrupt's creditors.[1] The case is presently before the Court on plaintiff's motion to strike the demand of certain defendants that this matter be tried before a jury. For the reasons stated herein, the motion is granted.

### I.

Plaintiff was appointed Trustee of Titus' bankruptcy estate on July 12, 1976, at the first meeting of creditors. He filed the initial complaint[2] in this action on May 11,

---

1. Jurisdiction with respect to defendant United States is based upon 28 U.S.C. § 2409a (West 1978) and 26 U.S.C. § 7426 (West 1967). Jurisdiction over all other defendants is claimed on the basis of 11 U.S.C. §§ 46, 96, 107(d), 110(e)(1), (e)(2), and (e)(3) (West 1953, 1968).

Some of these defendants dispute the jurisdiction of this Court; their contentions are not before the Court in the instant motion.

2. The initial complaint was brought to recover certain parcels of real property. On January 3, 1978, the Trustee filed an amended complaint

1977, alleging that certain properties, legal title to which is in the names of individuals and entities other than the bankrupt, are in reality owned by Titus, and should thus be held by his successor, the Trustee, for the benefit of creditors of the bankruptcy estate. The numerous individual and corporate defendants are those persons and entities presently holding legal title to the subject properties. The United States has been joined as a defendant because it is asserting federal tax liens for income and employment tax liabilities of the bankrupt (in excess of 2.4 million dollars) against all property and rights to property belonging to the bankrupt. The United States' interest in having Titus declared the owner of the subject property is aligned with that of the Trustee. Because, however, it is a priority creditor, whose claim to any properties recovered may supersede that of the Trustee, it has been joined as a defendant in an action to quiet title to the properties. Defendants Steelgard, Inc., DeWayne Titus, Jr., Orville W. Titus, Danny Titus and Suzette Titus made timely demands for trial by jury.

The complaint sets forth four causes of action. First, the Trustee seeks to set aside, as fraudulent, transfers of some twenty-four parcels of real property, the title[3] to which is or was formerly held in the names of some forty-six defendants.[4]

In conjunction with these claims, the Trustee seeks to obtain title to these properties, to recover, after an accounting, all rents, profits, and payments received from them, and to enjoin further exercise of control over them by defendants.[5] In addition, the Trustee seeks to recover assets held by Steelgard, Inc. on the theory that it is the *alter ego* of DeWayne Titus, Sr. or, alternatively, under a fraudulent conveyance theory.[6]

The machinations allegedly employed by Titus from 1969 to the present to conceal his assets defy simple description. At trial, plaintiff intends to trace the chain of title of each parcel of property through a maze of transfers, beginning with money held by Titus in several bank accounts, and ultimately resting with various defendants.[7] Titus' alleged *modus operandi* involved innumerable transfers and reconveyances of properties and funds, and the formation, dissolution, and reorganization of numerous corporations alleged to be under his control and ownership, in a labyrinthine scheme to conceal, launder, and reinvest assets, all for the purpose of hindering and defrauding his creditors.

## II.

In this country there has always been a strong presumption in favor of jury trials for resolving issues of fact in civil

---

which added Steelgard, Inc. and those of its shareholders not already parties to the suit. All references to "the complaint" hereinafter shall refer to the amended complaint.

**3.** Defendants are alleged to hold the following interest, *inter alia*, in the subject property: lien, grant deed, quit claim deed, fee, security interest, deed of trust, encumbrance.

**4.** The original and amended complaints listed a total of some 55 defendants. Approximately 15 defendants remain actively involved in the litigation. Others have left the case pursuant to default judgments, summary judgments, conditional dismissals, voluntary dismissals, or were never successfully served. Approximately one half of the parcels originally sought by the Trustee are still involved in the action.

**5.** Plaintiff's motion for preliminary injunction in regard to certain parcels of property was granted in part on May 21, 1978, and thereafter

modified in several respects upon stipulations of the parties.

**6.** The Trustee also had a claim for conversion against Steelgard, Inc., which was voluntarily dismissed on April 24, 1979.

**7.** For example, plaintiff intends to show that Parcel M, note and second deed of trust on Lot 53 of Monterey Townhouses, passed through the following chain of title: Barbary Coast Properties to James Randall Collins, trustee, to Gordon W. Nelson, to Ervin Albert, back to Nelson trustee, to John Cecil Proctor, note and second deed of trust to Nelson trustee, to Mary Teresa Fearon Kolsch Titus. Proof of this scheme is further complicated by the fact that most defendants have at various times held title to several different parcels. The Appendix to this Opinion, taken from a memorandum submitted by defendant United States, summarizes some of the transactions at issue.

litigation. *Dimick v. Schiedt,* 293 U.S. 474, 485–86, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Beacon Theatres v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Nonetheless, the Seventh Amendment right to a jury trial is neither absolute nor rigidly applied. It must oftentimes yield to other considerations such as procedural innovations, *Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), or the inability of jurors to understand and decide a case. *Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv.L.Rev. 898 (1979) (hereinafter cited as "Harvard Note"). Central to the concept of a jury trial is the notion that litigants' rights will be adjudicated in a fair manner by impartial, capable fact finders representing a cross section of the community. To ensure fair and rational decisions, the right to trial by jury has been limited throughout history in two often overlapping areas: cases arising under "equity" and cases which are extraordinarily complex. *In re United States Financial Securities Litigation,* 75 F.R.D. 702, 708–09 (S.D.Cal.1977); *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 67–68 (S.D.N.Y.1978).

■ In recent years, the Supreme Court has on several occasions addressed the scope of a litigant's Seventh Amendment rights,[8] and in so doing has developed standards governing the right to trial by jury. Under the standard applicable to this case, the three-pronged test found in footnote ten of *Ross v. Bernhard, supra,*[9] a district court must characterize each issue in the case before it as legal or equitable according to the following criteria: "first, the *pre-merger custom* with reference to

such questions; second, the *remedy sought*; and third, the *practical abilities and limitations of juries.*" 396 U.S. at 538, 90 S.Ct. at 738 n. 10. Each and every legal issue is entitled to be tried before a jury.

■ Plaintiff and defendant United States, shortly before the original trial date and after extensive discovery, jointly moved to strike defendants' jury demand, contending that, under the above criteria, all issues in this case are equitable. Although the Court must examine all pleadings in applying the *Ross* test, the right to a jury trial cannot be made to depend solely upon the choice of words used in any particular pleading, *Dairy Queen v. Wood,* 369 U.S. 469, 477–79, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the prayer for relief in the complaint, *Prudential Oil Corp. v. Phillips Petroleum Co.,* 392 F.Supp. 1018, 1022 (S.D.N.Y.1975); 5 J. Moore, Federal Practice ¶ 38.17 (2d ed. 1978) (hereinafter cited as "Moore"), or the supposed intent of the pleader. *Schaefer v. Gunzburg,* 246 F.2d 11, 13 (9th Cir. 1957), *cert. denied,* 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43 (1957). Rather, the Court must consider the nature of the issues in the case before it, regardless of how they have been labeled by the pleader. 9 C. Wright and A. Miller, Federal Practice and Procedure § 2804 (1971) (hereinafter cited as "Wright & Miller"). Each claim or issue which the Court finds to be "legal" is entitled to trial by jury, without regard to its weight relative to the remainder of the case, *Dairy Queen v. Wood, supra,* 369 U.S. at 473, 82 S.Ct. 894; or to the character of the overall action, *Ross v. Bernhard, supra,* 369 U.S. at 538, 90 S.Ct. 733. Having examined countless pleadings and decided numerous motions, this Court, now intimately

**8.** *Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Atlas Roofing Co. v. Occupational Safety & Health Review Commission,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Dairy Queen v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres v. West-*

*over,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

**9.** Although there has been some debate with respect to the historical validity of this test, it has been generally adopted and applied by lower courts. *See Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 69 (S.D.N.Y.1978) (and cases cited therein); and Harvard Note at 904. *But see In Re Japanese Electronic Products Antitrust Litigation,* 478 F.Supp. 889 (E.D.Pa.1979).

familiar with the *Titus* case, finds that, under the criteria set forth in *Ross v. Bernhard, every* remaining issue and claim for relief is equitable in nature.

## A. *Pre-Merger Custom*

Under the tripartite test in *Ross*, we must initially determine the pre-merger custom in regard to the requested claims. The gravamen of this entire action is fraud. Actions for fraud are not readily characterized as legal or equitable, and are more aptly described according to the attendant remedies sought. *Hyde Properties v. McCoy*, 507 F.2d 301, 305 (6th Cir. 1974); 5 Moore ¶ 38.20; 9 Wright & Miller § 2311. Actions for fraudulent conveyance, however, seeking something more than a money judgment, have traditionally been deemed equitable. *See, e. g., Johnson v. Gardner*, 179 F.2d 114 (9th Cir. 1949), *cert. denied*, 339 U.S. 935, 70 S.Ct. 661, 94 L.Ed. 1353 (1950); *Hyde Properties v. McCoy, supra; Senchal v. Carroll*, 394 F.2d 797 (10th Cir. 1968), *cert. denied*, 393 U.S. 979, 89 S.Ct. 448, 21 L.Ed. 440 (1968); *Damsky v. Zavatt*, 289 F.2d 46 (2d Cir. 1961); *Mission Bay Campland, Inc. v. Sumner Financial Corp.*, 72 F.R.D. 464 (M.D.Fla.1976); *Conn v. Kohlemann*, 2 F.R.D. 514 (E.D.Pa.1942); *Williams v. Collier*, 32 F.Supp. 321 (E.D.Pa. 1940); 9 Wright & Miller § 2311 at 53–54; 5 Moore ¶ 38.30[4] at 228–29.[10] The reason for this frequent characterization was well summarized by Professor Moore:

> "The machinations of fraud are often devious. And so where to undo them the trustee is entitled to have certain property impressed with a trust, to have an accounting, to have a mortgage, deed or other conveyance of an interest in real property cancelled, and the trustee's title quieted, or to have other relief of an equitable nature, the issues are for trial to the court." 5 Moore ¶ 38.30[4] at 229–30 (footnotes omitted.)

Although the underlying basis for the Trustee's claims, fraud, is usually considered equitable in fraudulent conveyance cases, we must nevertheless withhold final judgment until after examination of the remedies sought.

## B. *Remedy Sought*

The second part of the *Ross* test, analysis of the remedy sought, requires a good deal more consideration. In characterizing a remedy, as in characterizing an underlying action, we must first examine its incidence historically. In addition, prior to authorizing entitlement to an equitable remedy, we must find that there are no adequate legal alternatives.

The Trustee has requested the following remedies, stated in the alternative, in his complaint: that the alleged fraudulent transfer be declared void; that title to subject properties be quieted in the plaintiff; that judgment in this action be declared a lien on each parcel of real property; that the Court enjoin defendants from disposing of any of the subject properties; that defendants be ordered to reconvey the properties to plaintiff; that an account be taken of all rents, profits or payments received by defendants and that plaintiff have judgment for such sums; that the Court declare the rights of the plaintiff with respect to liens filed by defendant United States against Titus; that the Court declare either that defendant Steelgard, Inc. is the *alter ego* of DeWayne Titus, Sr., that all of the shares of stock in Steelgard, Inc. are held for the benefit of Titus, or that Steelgard, Inc. received its assets from Titus in fraud of his creditors. In subsequent pleadings, the Trustee has simplified his demand as basically one for the imposition of constructive trusts upon the subject property.

Defendants, recognizing that injunction, reconveyance, and equitable lien are equitable remedies, contend that they are nevertheless entitled to a jury with respect to the quiet title action and to any accounting and resultant money judgments. In addition, they contend that use of the *alter ego* theo-

---

**10.** Certain of these cases set forth law which may no longer be completely accurate in light of more recent Supreme Court decisions. They nevertheless articulate the "pre-merger custom" with respect to actions concerning fraudulent conveyances.

ry in this case is improper. Upon close analysis, however, the Court finds each remedy sought by the Trustee to be proper and equitable in nature.

The parties agree that actions to quiet title have traditionally been equitable. Defendants contend, however, that in this case the Trustee has an adequate remedy at law—ejectment—which precludes his use of an action to quiet title. Relying upon well-established precedent, they argue that when the moving party is not in possession of the subject property, as in this case, an ejectment action must be undertaken instead of quiet title, if it would afford a clear, adequate legal remedy. *Whitehead v. Shattuck*, 138 U.S. 146, 11 S.Ct. 276, 34 L.Ed. 873 (1891); *Fort Mojave Tribe v. La Follette*, 478 F.2d 1016 (9th Cir. 1973); *Humble Oil & Refining Co. v. Sun Oil Co.*, 191 F.2d 705, 718 (5th Cir. 1951), *cert. denied*, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952); *cf. Twist v. Prairie Oil Co.*, 274 U.S. 684, 691, 47 S.Ct. 755, 71 L.Ed. 1297 (1927) (under certain circumstances a quiet title action can be maintained even though the moving party is not in possession).

This line of authority does not require ejectment to be used in the present case, however, because ejectment would *not* provide an adequate remedy. The primary purpose of an action for ejectment is to recover possession; and although such an action may additionally be the means of trying title, an ejectment judgment does not itself transfer title. *Zaccaria v. Bank of America N.T. & S.A.*, 164 Cal.App.2d 715, 718–19, 331 P.2d 198, 200–01 (1958). But it is precisely recovery of title, not possession, which the Trustee here seeks. More important, ejectment is not available to persons who do not hold legal title to the property at stake. D. Dobbs, Remedies 26, 59, 230, 240 (1973) (hereinafter cited as "Dobbs").

"The plaintiff who was led to convey his land by the fraud of the defendant had no remedy in ejectment * * *. *The defendant who fraudulently secured plaintiff's title could not be ejected, since he had title*; but he could be told to reconvey by a court with power to enter such an in personam order. That court was the equity court, and it would express the defendant's liability to reconvey by calling him a constructive trustee." *Id.* at 240 (emphasis added).

Because legal title presently rests with the defendants, an action in ejectment is not possible, and plaintiff has no choice but to seek the equitable remedies of quiet title, or, alternatively, constructive trust.[11]

Imposition of a constructive trust, the most comprehensive remedy sought by plaintiff, is clearly appropriate in the context of this case. Such relief is frequently sought in cases involving fraudulent conveyances and it is clearly equitable. *Black v. Boyd*, 248 F.2d 156, 162 (6th Cir. 1957); Dobbs at 11, 26, 247. It is the primary remedy used to compel specific restitution[12] from third parties where the plaintiff has no legal title and his claim must therefore be founded on equitable considerations. *Id.* at 247. The duties of a constructive trustee are no different from those required of an actual trustee. When the trust is impressed, the moving party (in this case the Trustee in Bankruptcy) is deemed the beneficial owner of the subject property. The party holding legal title (in this case the fraudulent grantees) becomes the "trustee *ex maleficio*," and is required to produce the trust corpus, or property, and to produce or account for whatever income has been derived from it. *Buffum v. Barceloux Co.*, 289 U.S. 227, 236–37, 53 S.Ct. 539, 77 L.Ed. 1140 (1933).

There is quite clearly no comparable adequate legal remedy available to the Trustee. The legal alternative to imposition of a constructive trust would be to require the Trustee simply to disregard the conveyanc-

11. Additionally, it is clear that under federal law there is no right to a jury trial on the quiet title action against the United States. 28 U.S.C. § 2409a(e) (West 1978).

12. All of the relief sought in this action is of an equitable restitutionary nature; that is, to prevent the "unjust enrichment" of defendants by returning to plaintiff wrongfully withheld property and gains derived therefrom.

es and attach or levy execution upon the property conveyed. Cal.Civ.Code § 3439.09 (Deering 1972). This remedy, however, would create a risk of liability for wrongful attachment or execution, does not provide for tracing or any means of reallocating assets to enable full access by the Trustee, and would not effectively quiet title in the Trustee, who would then have to initiate a separate action. *Hyde Properties v. McCoy, supra,* 507 F.2d at 306; *Mission Bay Campland, Inc. v. Sumner Financial Corp., supra,* 72 F.R.D. at 467–68; Dobbs at 248; 1 J. Story, Equity Jurisprudence 430–31 (1877); 5 Moore ¶ 3820 at 176–77.[13]

■ The other forms of relief sought by plaintiff, an accounting and a money judgment for rents and profits, are integral parts of a constructive trust. As such, there is no basis for imbuing either one with a legal character. Thus, should this Court impose a constructive trust, any resultant accounting or money judgment would, as part and parcel of that constructive trust, also be equitable. Nevertheless, there is a great deal of confusion in this area because such relief has in other types of cases been found legal. Thus, further explanation is required.

■ An accounting, which involves a scrutiny of business records to calculate the amount of rents, profits, and other payments captured by a wrongful grantee, is frequently a component of a constructive trust. It is essentially a form of disclosure, predicated upon the legal inability of a plaintiff to determine if, or how much, money is due him from another. *Bradshaw v. Thompson,* 454 F.2d 75 (6th Cir. 1972), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972); 1 J. Story, Equity Jurisprudence 510 (1877). Although an action

for accounting originated in common law courts, its availability at law was short-lived. But its substance was carried forward in equity as a "bill for accounting," and could be invoked in three circumstances: (1) when the relationship of the parties created an equitable duty to account (*e. g.,* the duty to account imposed upon a trustee or constructive trustee); (2) when the complicated nature of accounts would make it difficult, if not impossible, for a jury to unravel numerous transactions; (3) when an accounting on an otherwise legal claim was incidental to a demand for an injunction or other equitable relief. 9 Wright & Miller § 2310 at 48.

In *Dairy Queen,* which involved an accounting incidental to injunctive relief in an otherwise legal action, the Supreme Court severely curtailed the availability of an equitable accounting, stating that

"[t]he necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres,* the absence of an adequate remedy at law. Consequently, in order to maintain such a suit *on a cause of action cognizable at law,* as *this one* is, the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them. In view of the powers given to District Courts by Federal Rule of Civil Procedure 53(b) to appoint masters to assist the jury in those exceptional cases where the legal issues are too complicated for the jury adequately to handle alone, the burden of such a showing is considerably increased and it will indeed be a rare case in which it can be met." *Dairy Queen v. Wood, supra,* 369 U.S. at 478, 82 S.Ct. at 900 (emphasis added, footnotes omitted).

---

13. In setting aside fraudulent transfers, the Trustee may rely upon either Section 70(e) of the Bankruptcy Act, 11 U.S.C. § 110 (West 1953), which incorporates in part state law (Cal.Civ.Code § 3439.09 is the relevant law in this case), or Section 67(d) of the Bankruptcy Act, 11 U.S.C. § 107 (West 1953), which sets forth its own legal standards. In addition to the reasons for finding no adequate legal remedy set forth in the text, which are based upon

California law, Section 70(e) has been interpreted to authorize a trustee to proceed "by a bill in equity" without having first exhausted all legal remedies. *Schainman v. Dean,* 24 F.2d 475, 476 (9th Cir. 1924) (citing Brandenburg on Bankruptcy § 1127), *cert. denied,* 278 U.S. 598, 49 S.Ct. 7, 73 L.Ed. 527 (1928); *see also, Barceloux v. Buffum,* 51 F.2d 82, 83 (9th Cir. 1931), *modified and affirmed on other grounds,* 289 U.S. 227, 53 S.Ct. 539, 77 L.Ed. 1140 (1933).

Only in rare cases did the court anticipate that thenceforward an accounting would warrant a nonjury trial. ′ *Id.* Although *Dairy Queen* abolished the use of an equitable accounting as merely incidental to equitable relief in an otherwise legal action and limited its availability in complex cases, it left intact the right to an equitable accounting where the duty to account is itself of an equitable origin. *Id.* at 480, 82 S.Ct. 894. (Harlan, J. concurrence); 9 Wright & Miller § 2310.

 In the case at bar, if plaintiff prevails he will be entitled to an equitable accounting on the firmest remaining ground for such relief: the duty to account incumbent upon a constructive trustee. *Andersen, Meyer & Co. v. Fur & Wool Trading Co.*, 14 F.2d 586, 589 (9th Cir. 1926); *Williams v. Collier*, 32 F.Supp. 321, 324 (E.D.Pa.1940); 9 Wright & Miller § 2310 at 48; 5 Moore ¶ 38.25 at 199–203; Dobbs at 252–53. In such cases the jurisdiction of equity is exclusive.[14] 5 Moore ¶ 38.25 at 199; 1 J. Story, Equity Jurisprudence 434 (1877). As Justice Cardozo made clear in *Buffum v. Barceloux Co., supra*, in upholding a suit in equity brought by a trustee in bankruptcy to recover the value of shares fraudulently transferred:

> "The trustee [*ex maleficio*] who misapplies the subject matter of a trust becomes accountable at once for the proceeds or the value. * * * The standard of duty is no different whether the trust to be enforced is actual or constructive. The implication of a trust is the implication of every duty proper to a trust." *Id.* 289 U.S. at 236–37, 53 S.Ct. at 542–543 (citations omitted).

 Thus, in this case, should a constructive trust be imposed, the fraudulent grantees will thenceforward be found to hold properties for the benefit of plaintiff, and will have an equitable duty to account for any rents, profits, or payments they have derived.[15] The same holds true with respect to Steelgard, Inc., and/or its shareholders. Because enforcement of this duty lies exclusively in equity, there is by definition no adequate legal alternative.[16]

 In conjunction with the accounting, plaintiff also seeks a money judgment for any sums defendants have wrongfully derived from the properties in question. Defendants, relying upon the following language in *Dairy Queen v. Woods, supra*, 369 U.S. at 476–77, 82 S.Ct. at 899, contend that *any* request for monetary relief creates a legal issue, to be tried to a jury:

> "Petitioner's contention * * * is that insofar as the complaint requests a money judgment it presents a claim which is unquestionably legal. We agree with that contention. * * * [W]e think it plain that their claim for a money judgment is a claim wholly legal in its nature however the complaint is construed. As an action on a debt allegedly due under a contract, it would be difficult to conceive of an action of a more traditionally legal character. And as an action for damages based upon a charge of trademark infringement, it would be no less subject to cognizance by a court of law." (Footnotes omitted.)

Defendants have misconstrued this language. The Court simply held that the request for a money judgment *in the case before it* was legal because the request was based upon legal claims. This limited holding certainly did not disturb the long-established principle, confirmed in cases subsequent to *Dairy Queen*, that monetary relief

---

14. Under the two other former rationales for an equitable accounting, courts of law had concurrent jurisdiction with equity courts.

15. An accounting can be used to establish existence as well as amount of liability.

16. For reasons discussed in a subsequent section of this Opinion, an equitable accounting is additionally warranted because the accounts in this case, as in many cases involving fraudulent

conveyances, are of an extremely complex nature. *See, e. g., Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974); *Senchal v. Carroll*, 394 F.2d 797, 798–99 (10th Cir. 1968); *Williams v. Collier*, 32 F.Supp. 321 (E.D.Pa. 1940). The justification for an equitable accounting abolished in *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), is not relevant to this case.

may flow from an equitable claim without acquiring a legal character. *See, e. g.,* in various contexts, *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Slack v. Havens,* 522 F.2d 1091, 1094 (9th Cir. 1975); *Pearson v. Western Electric Co.,* 542 F.2d 1150, 1152 (10th Cir. 1976); *Harkless v. Sweeny Independent School District,* 427 F.2d 319, 324 (5th Cir. 1970); *Cox v. Kansas City,* 76 F.R.D. 459 (W.D.Mo.1977); *Cayman Music, Ltd. v. Reichenberger,* 403 F.Supp. 794, 796 (W.D.Wis.1975); *Marr v. Rife,* 363 F.Supp. 1362, 1363 (S.D.Ohio 1973).[17] In *Curtis v. Loether, supra,* 415 U.S. at 196, 94 S.Ct. at 1009, the Supreme Court stated unequivocally that "We need not, and do not, go so far as to say that any award of monetary relief must necessarily be 'legal' relief." Where monetary relief is an "integral part of an equitable remedy" it remains equitable in nature. *Id.* at 197, 94 S.Ct. at 1010.

Nor, as defendants contend, is the availability of a money judgment dependent upon the equitable "clean-up doctrine," [18] rejected by the Supreme Court in *Beacon Theatres.* As the United States Court of Appeals for the Ninth Circuit explained in *Slack v. Havens, supra,* 522 F.2d at 1094:

> "[T]he [Supreme] Court left little doubt that not all awards of monetary relief should necessarily be characterized as legal relief for purposes of the jury trial requirement. Appellants' claim that a jury trial must be afforded whenever any 'legal' characteristic is associated with a primarily 'equitable' action fails. Here, the award of back pay is an integral part of the equitable remedy of reinstatement. * * * [T]o consider it apart from that context would be to distort the traditional line dividing legal from equitable remedies."

The court distinguished *Beacon Theatres* and *Dairy Queen* as "cases [which] involved a joinder of *several claims,* some legal, some equitable, and not a situation * * * in which a *single cause of action* must be characterized as itself legal or equitable." *Id.* (emphasis added).

The monetary relief sought by plaintiff in this case is clearly an integral part of the equitable and restitutionary relief he seeks, rather than relief emanating from a separate, legal claim. Plaintiff simply wants to recover, not damages, but monies which have been wrongfully withheld by the fraudulent grantees/constructive trustees. Moreover, the basis for this action, fraud, appears to be wholly equitable in nature within the context of this case.

Finally, it is undisputed that the *alter ego* doctrine is equitable. *Arnold v. Browne,* 27 Cal.App.3d 386, 394, 103 Cal. Rptr. 775, 781 (1972) (*see also* cases cited therein); Note, *A Bankruptcy Trustee's Avoiding Power, A Creditor's Attachment Lien, and the Alter Ego Doctrine,* 48 S.Cal. L.Rev. 56, 59–60 (1974). And despite defendants' protestations to the contrary, the doctrine may be used both in its classic sense, to pierce the corporate veil to impress the debts of a corporation upon an individual, or in a "reverse" sense, to disregard the corporate form to reach the assets of a corporation for the debts of an individual. *Hudson v. Wylie,* 242 F.2d 435, 441–42 (9th Cir. 1957), *cert. denied,* 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957); *Pacific Development, Inc. v. United States,* 79–1 USTC ¶ 9138 (D.D.C. Jan. 3, 1979); Note, 48 So. Cal.L.Rev. 80–81.

Thus, all of the actions and remedies in this case are and have historically been considered equitable in nature.[19]

**17.** Prior to *Dairy Queen,* this Circuit reached the same conclusion in the context of a fraudulent conveyance case. *See Johnson v. Gardner,* 179 F.2d 114, 116 (9th Cir. 1949).

**18.** 359 U.S. at 507–08, 79 S.Ct. 948. *See also, Dairy Queen v. Wood,* 369 U.S. 469, 470, 473 n.8, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). This doctrine was a source of equity jurisdiction whereunder an equity court heard legal claims intertwined with the claims before it when necessary to fully adjudicate a case.

**19.** Moreover, the fact that plaintiff is seeking declaratory relief does not alter the equitable nature of his underlying claims. *Ross v. Bernhard,* 396 U.S. 531, 540, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Simler v. Conner,* 372 U.S. 221, 223, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).

### C. Practical Abilities and Limitations of Jurors

The final element of the *Ross* test requires this Court to determine, keeping in mind the presumption in favor of juries, to what extent the complexity of this case will prevent a jury from fairly deciding it. If, after examining each issue in this case, the Court finds that it would be virtually impossible for a jury to understand and render a rationally based decision, then plaintiff's remedy "at law" is inadequate,[20] and he is entitled to a trial before the Court. In view of the Court's determination thus far, that under the first two factors of the *Ross* inquiry the case is equitable and should be tried to the Court, this third element does not have strong independent significance. Instead, the additional conclusion the Court reaches, that the case is in fact too complex for a jury, merely reinforces the Court's decision on the other two grounds.

Authorities are in disagreement as to the underpinnings of a court's authority to deny a jury demand on the ground that a case is too complex. Judge Sharp, in *In re Boise Cascade Securities Litigation*, 420 F.Supp. 99, 105 (W.D.Wash.1976), found the third part of footnote 10 in *Ross* to be of constitutional dimensions, that is, to be a limitation to or interpretation of the Seventh Amendment. Some commentators are of the opinion that the Fifth Amendment's due process clause requires that litigated matters be decided by a competent arbiter. F. Kirkham, *"Complex Civil Litigation—Have Good Intentions Gone Awry?", The Pound Conference*, 70 F.R.D. 79, 209 (1976) (hereinafter cited as "The Pound Confer-

ence"); Harvard Note at 910–11. Alternatively, authority can be found in a court's traditional equity powers, The Pound Conference at 209; *Bernstein v. Universal Pictures, Inc., supra*, 79 F.R.D. at 67, or in general prudential principles. *See generally, Parklane Hosiery v. Shore, supra.*

Having examined the informative opinions of several courts which in recent years have denied jury trials on grounds of complexity,[21] we share the view that it is difficult, if not impossible, to pinpoint precise standards for evaluating a jury's competence to decide a given case. Thus we must decide, based upon somewhat general standards, and upon the Court's prior experience with the capabilities of juries, whether a jury would in this case be competent to perform its traditional function, namely to understand the facts in evidence and reach a reasoned decision by deduction and inference. *Bernstein v. Universal Pictures, Inc., supra*, 79 F.R.D. at 70; Harvard Note at 898, 906–08; F. James, Jr., *Sufficiency of the Evidence & Jury Control Devices Available Before Verdict*, 47 U.Va. L.Rev. 218, 221 (1961). The following general standard articulates what the Court believes to be the appropriate approach to this question:

"A case is too complex for a jury * * when it leaves the jurors unable either to comprehend the facts in evidence or to reason from them to a verdict. A number of factors may contribute to the complexities of a case: the length, the number of parties and issues involved, the magnitude of the evidence, the conceptual sophistication of the issues, or an eso-

---

**20.** "Remedy at law" signifies the "comprehensive response by a court of law to an alleged wrong," including both the procedural and remedial aspects of an action. The inability of a jury to reach a reasoned decision is one type of procedural shortcoming rendering a legal remedy inadequate. Harvard Note at 905; *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 66 (S.D.N.Y.1978).

**21.** *Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974); *ILC Peripherals v. IBM*, 458 F.Supp. 423, 444–48 (N.D.Cal.1978); *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 65–71 (S.D.N.Y.1978); *In re United States Financial*

*Securities Litigation*, 75 F.R.D. 702, 708–14 (S.D.Cal.1977); *SEC v. Associated Minerals, Inc.*, 75 F.R.D. 724, 726 (E.D.Mich.1977); *In re Boise Cascade Securities Litigation*, 420 F.Supp. 99. Cf. *Tights, Inc. v. Stanley*, 441 F.2d 336, 340–43 (4th Cir. 1971); *In re Japanese Electronic Products Antitrust Litigation*, 478 F.Supp. 889 (E.D.Pa.1979); *Radial Lip Machine, Inc. v. International Carbide Corp.*, 76 F.R.D. 224, 226–28 (N.D.Ill.1977); *Jones v. Orenstein*, 73 F.R.D. 604, 606 (S.D.N.Y.1977), wherein courts refused to strike jury demands either on doctrinal grounds or because the cases did not appear sufficiently complex.

teric subject matter." Harvard Note at 898–99.

*See also*, The Pound Conference at 208–09.

Under this admittedly amorphous standard, it is apparent to this Court that the case before it is not amenable to a jury trial. The pretrial papers reveal the following in regard to its length and complexity: Plaintiff and the Titus defendants have each listed 78 somewhat conflicting factual issues, 66 somewhat overlapping witnesses, and thousands of exhibits. They have estimated that the trial will last 2 to 4 months. Defendant United States seeks to gain title to properties for which it has filed 8 notices of federal tax lien and 13 notices of levy, and has listed 17 witnesses.

The factor with which the Court is chiefly concerned, however, is the number and complexity of issues involved in this case. As briefly set forth at the outset of this Opinion, the finder of fact will have to wend its way through literally hundreds of interrelated real property transactions, and become entangled in numerous bank accounts, conveyances, and intricate exchanges of different types of property interests which have occurred over a period of close to ten years.[22] Moreover, the fact finder will be called upon to unravel numerous transactions involved in the formation of Titus' many corporations (some of which have already been adjudicated his "*alter ego*") and their acquisition, use, and transfer of assets (machinery, equipment and productions) allegedly belonging to Titus. In addition, the finder of fact must understand not only the chain of ownership with respect to each individual property, but must also be able to synthesize all of the evidence and deter-

mine whether it proves the existence of one comprehensive scheme involving all of the properties in question. Finally, the parties will undoubtedly disagree as to proper accounting principles to be employed in tracing Titus' assets and in calculating the rents and profits, if any, due to the Trustee over and above recovery of the properties. This case presents exactly the type of situation one commentator has described as unsuitable for decision by a jury:

> "[I]n multi-party suits, there may be so many claims, counterclaims, and crossclaims, predicated on differing, yet interdependent legal grounds and requiring separate, yet related proof, as *to defy the ability of jurors to organize the evidence coherently in order to reach a rational verdict.*" Harvard Note at 899 (emphasis added).

Although the Court is mindful that this case must be examined on its own merits, the Court also takes notice of the fact that it is not unusual for cases involving fraudulent conveyances to be tried to the court on grounds of complexity. *See* note 16, *supra.*

In sum, the size of the litigation, and more important, the complexity of the relationships among the parties, render this action as a whole beyond the ability and competence of any jury to understand and decide with rationality.[23]

Thus, under each of the three factors of the test in *Ross*, the Court finds that all of the issues in this case are equitable. Accordingly,

IT IS HEREBY ORDERED that the motion to strike the demand for jury trial filed in this case is hereby granted.

---

**22.** See Appendix, listing some of the transactions the finder of fact must unravel.

**23.** Nor does the Court think there are any procedural devices, short of striking the jury, which would substantially remedy the inadequacies of a jury. *Dairy Queen v. Wood*, 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Even though a special master might be useful in sorting out accounts, the jury would still have to integrate evidence adduced by the master into other complicated facts under several theories of liability. And the master could not properly be expected to make findings on liabil-

ity, particularly in regard to fraud. *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 70 (S.D.N.Y.1978); *In re United States Financial Securities Litigation*, 75 F.R.D. 702, 713 (S.D. Cal.1977); *Bradshaw v. Thompson*, 454 F.2d 75, 80 (6th Cir. 1972). Severance, an alternative suggested by defendants, would be inefficient in that all of the transactions have critical elements of proof in common, and would be unfair to plaintiff, whose theory of the case requires proof of a comprehensive scheme common to all transactions.

APPENDIX

*Group I: Property once standing in De-Wayne Titus, Sr.'s, individual name. Parcel W,* Titus' former residence on Mission Boulevard in Fremont, is the only parcel in this category. The deed of trust standing in Danny and Suzette Titus' name is at issue here.

*Group II: Property once standing in the name of alter ego corporations of Titus.* This group comprises the following parcels:

(1) *Parcel B,* lot 38 of the Monterey Townhouses.

*Chain of Title:* Barbary Coast Properties (BCP), wholly owned by Titus, Sr., to Collins, trustee, to three Titus sons, to Danny Titus.

(2) *Parcel J,* lot 50 of Monterey Townhouses.

*Chain of Title:* BCP to Mildren Titus (Titus, Sr.'s ex-wife), to Orville Titus.

(3) *Parcel M,* note and second deed of trust on lot 53 of Monterey Townhouses.

*Chain of Title:* BCP to Collins trustee, to Gordon W. Nelson, to Ervin Albert (Thelma Reno's brother), back to Nelson trustee, to Proctor, note and second deed of trust to Nelson trustee, to Mary Teresa Fearon Kolsch Titus.

(4) *Parcel O,* note and second deed of trust on lot 55 of Monterey Townhouses.

*Chain of Title:* BCP to Collins trustee, to James and Patricia Collins, back to BCP, to Gordon Nelson, to William Pollack, note and second deed of trust to BCP, to Mary Teresa Fearon Kolsch Titus.

(5) *Parcel P,* lot 56 of the Monterey Townhouses.

*Chain of Title:* BCP to Collins trustee, to Larry Watson (Titus' all-purpose nominee), to Ella Louise Watson, back to Larry Watson. (Also note and second deed of trust from Watson to BCP for $4,900 cancelled for no consideration).

(6) *Parcel Q,* laundromat adjacent to Monterey Townhouses.

*Chain of Title:* BCP to Thelma Reno, to Dixon, note and second deed of trust in favor of Reno (proceeds have now been deposited in Court).

(7) *Parcel R,* 1st and Orange Streets in Patterson.

*Chain of Title:* BCP to Thelma Reno (11/1/72).

*Group III: Property never standing of record in the name of either Titus, Sr. himself or any of his alter ego corporations, but which were funded in whole or in part with Titus, Sr.'s, money or money of his alter ego corporations.* This group includes:

(1) *Parcel S,* McCracken Road.

*Chain of Money:* BCP's money ($2,500) deposited into escrow as deposit, Titus, Sr.'s, money ($10,065) used for downpayment—title in DeWayne Titus, Jr., to Orville Titus, back to Titus, Jr.

(2) *Parcel U,* Vernalis Airport.

*Chain of Money:* Titus, Sr.'s, or BCP's money ($32,500 out of proceeds of 1st and Orange and $200,000 "gift," plus Titus funds commingled in Kolsch's account) for downpayment—title in Gordon Nelson trustee (option to purchase), title on 10/19/76 *after bankruptcy* to Mary Teresa Fearon Kolsch Titus and Danny Titus as to undivided one-half interest.

(3) Note and Deed of Trust on *Parcel T,* Walnut Orchard.

*Chain of Money:* Steelgard money ($25,000) loaned to Titus, Sr., plus Titus, Sr.'s, money from T.C.D. in Danny Titus' name ($5,500) used to acquire deed of trust in Danny and Suzette Titus' name.

(4) Orville Titus' Residence on Parkmont Drive.

*Chain of Money:* 40 containers (valued at $16,000) belonging to ABC Container * * used for downpayment—title in Orville Titus.

(5) Modular Investments.

*Chain of Money:* Titus, Sr.'s money ($65,315.97) used to pay one-half of purchase price of portable classroom buildings plus Titus, Sr.'s, money (at least $30,000) "loaned" to corporation—one-half of corporation's stock in Danny Titus' name.

(6) Bay Container.

*Chain of Money:* Containers of ABC Container sold/leased; proceeds deposited to Bay Container's account, signatories Luanne Schley (former personal secretary) and Gordon Nelson.

(7) Mod Structures.

*Chain of Money:* Funds physically put up by Mary Teresa Fearon Kolsch to acquire 100% of stock, facilities and personnel provided by Steelgard.