**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lawrence A. WESTLEY; Cecelia W.
Westley, Defendants–Appellants.**

**No. 98–6054.**

United States Court of Appeals,
Sixth Circuit.

March 21, 2001.

---

Before KENNEDY, NELSON, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

This case presents the question of the extent of transferee liability for a corporation's unpaid federal income taxes when the shareholders received a distribution of corporate assets that liquidated the corporation. Such a question is usually straightforward, but this case has been unnecessarily complicated by the Government's dilatory collection efforts to recover the unpaid corporate income tax liability of Supreme Mortgage and Realty Company, Inc. ("Supreme Inc.") from its corporate shareholders.

I.

Mr. and Mrs. Westley, along with a Mr. Willis, were the sole shareholders in Supreme Inc.[1] On May 9, 1983, the three shareholders approved a plan to liquidate Supreme Inc.'s assets and terminate the corporation. Supreme Inc. filed its Notice

of Corporate Dissolution with the I.R.S. on June 2, 1983. The Westleys claim that the sole purpose for this liquidation was to avoid a substantial amount of income tax that would have accrued from the sale of Supreme Inc.'s mortgage servicing contracts. *See* 26 U.S.C. § 337. This tax-saving effort was unrelated to the assessed tax deficiencies resulting from Supreme Inc.'s earlier tax returns.

In order to comply with section 337, the shareholders were required to liquidate Supreme Inc. within 12 months of the vote to authorize the liquidation. Therefore, on May 4, 1984, the assets were distributed to the shareholders in proportion to their stock holdings, and Supreme Inc. was liquidated. Mr. Westley received a distribution of $284,263.48; Mrs. Westley, $263,958.95; and Mr. Willis, $1,635,339. The three shareholders then directly invested their distributions to form Supreme Mortgage and Realty Company, a Tennessee partnership ("Supreme Partnership"). The Supreme Partnership continued to operate as the corporation had operated–out of the same location, doing essentially the same business, and with the same employees.

At the time that the shareholders were liquidating Supreme Inc., they were aware that the Government was auditing Supreme Inc.'s tax returns for the years 1979, 1980, and 1981. Supreme Partnership's financial statements indicate that, while the partners were disputing the legitimacy of the proposed deficiencies, a contingency for the payment of $517,549 for Supreme Inc.'s back taxes was allocated. Specifically, Note 10 to the Supreme Partnership's financial statement explains the tax situation as of December 31, 1984:

---

1. Mr. Westley held 14% of the stock; Mrs. Westley, 13%; and Mr. Willis, 73%. The government's brief indicates that Mr. Willis died prior to the Government's filing of this case in 1997, and, therefore, Mr. Willis was not named as a party to the lawsuit.

The Federal income tax returns of Supreme Mortgage and Realty Company, Incorporated have been examined for the three fiscal years ended September 30, 1981 and the Internal Revenue Service has proposed additional assessment plus penalty of approximately $517,549 for which provision has been made. The Corporation has been liquidated on May 4, 1984 and the assets were distributed and the liabilities assigned to the "former stockholders" who are the general partners of Supreme Mortgage and Realty Company, Partnership. The "former stockholders" do not agree with the proposed adjustments and are protesting a major portion of the adjustment. The "former stockholders" (Supreme, Incorporated), on advice of legal counsel have filed a protest contesting the tax liability. At this time, it is impossible to predict the ultimate outcome of these matters. Any additional liabilities resulting from an unfavorable ruling by the Tax Courts or from settlement with the Internal Revenue Service would result in a charge to the partners' capital accounts related to their initial capital injection into the partnership.

It is unclear exactly when the Government finalized its determination of deficiencies against Supreme Inc. and what steps Supreme Inc., through its former shareholders, took to protest the deficiencies. It is undisputed, however, that the deficiencies were not paid, and a petition for redetermination of the tax deficiencies was filed with the United States Tax Court. The Government moved to dismiss Supreme Inc.'s petition in the Tax Court on the ground that it was untimely. The Tax Court agreed and dismissed the case for lack of jurisdiction on May 10, 1988. Thereafter, on September 7, 1988, the Government entered a formal assessment against Supreme Inc. in excess of $880,000. However, the Government took no immediate steps to collect on the outstanding assessment.

Apparently, sometime prior to July 25, 1991, the Government proposed to collect from the Westleys the unpaid federal income taxes owed by the liquidated Supreme Inc. In response to this proposition, the Westleys' lawyer sent a letter on July 25, 1991, to the IRS agent assigned to the case. That letter challenged the Government's ability to collect Supreme Inc.'s corporate tax liability directly from the Westleys. Again, the record shows the Government did not respond to the attorney's letter, and from 1991 to 1997, the Government apparently took no action to collect Supreme Inc.'s taxes from the Westleys. In 1997, the Government filed the suit that is the subject of this appeal, claiming that Supreme Inc.'s distribution of assets to its shareholders in 1984 was a fraudulent conveyance making the Westleys liable as transferees for the unpaid taxes.

There is one additional wrinkle. During the time that the Government was not actively pursuing the collection of Supreme Inc.'s taxes, the Westleys became insolvent. In 1994, they filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code. The case was treated as a no-asset case, and the Westleys' debts were discharged on May 2, 1994.

II.

Initially, the Westleys moved the district court to dismiss the Government's complaint on the grounds that (1) the statute of limitations under the Tennessee Uniform Fraudulent Conveyance Act had run out, and, alternatively, (2) that the district court did not have jurisdiction because the proper forum was the bankruptcy court. The district court denied their motion. In response, the Government moved the district court for an order that the discharge

in bankruptcy did not preclude prosecution of the complaint in the district court, and that motion was granted.

The parties then each filed a motion for summary judgment. The district court entered an order granting the Government's motion and denying the Westleys' motion. *See United States v. Westley*, No. 97–2030, 1998 WL 427375 (W.D.Tenn. June 18, 1998). In that order, the district court held that the distribution of assets to the three shareholders of Supreme, Inc. (the Westleys and Mr. Willis) was a fraudulent conveyance of the assets of the corporation; the court ordered that the conveyance of the assets to the Westleys be set aside. The district court entered a final judgment on June 24, 1998, dismissing the case.

Apparently unaware of the final judgment entered on June 24, 1998, the Government moved the district court for an entry of final judgment seeking an order for the recovery of specific dollar amounts from the Westleys. The district court denied this motion as moot on July 22, 1998, and that same day, the Government moved for reconsideration because the district court had not addressed its request for a specific money judgment. On July 23, 1998, the Westleys filed their notice of appeal from the final order of June 24, 1998, dismissing the case. Later that day, the district court granted the Government's motion for reconsideration and entered an amended judgment against Mr. Westley for $412,904.52 and against Mrs. Westley for $383,411.34, plus interest on each judgment, computed from September 7, 1988.

On July 28, 1998, the Westleys filed their opposition to the Government's motion to reconsider, which the district court had granted on July 23, 1998. They argued that filing their notice of appeal deprived the district court of jurisdiction to amend the judgment. The Westleys also filed a motion on August 4, 1998, asking the district court to set aside the amended judgment. On August 7, 1998, the district court set aside the amended judgment, restored the original judgment *nunc pro tunc*, and gave the Westleys until August 21, 1998, to file a response.

The Government then moved this Court to dismiss the appeal for lack of jurisdiction because the district court had not yet entered a final order. Alternatively, the Government argued that the case should be remanded for the limited purpose of allowing the district court to rule on the outstanding motion for amended judgment. We denied the Government's motion, holding that the June 24, 1998, judgment purporting to dismiss the case in its entirety was a final judgment. The Government then sought certification from the district court that it was inclined to grant their pending motion. The district court responded that it was not inclined to grant the motion.

The Westleys appeal the district court's summary judgment order, claiming the court erred in holding that the distribution of assets from Supreme Inc. was a fraudulent conveyance and setting aside the 1984 distribution of assets. The Westleys' appeal is timely, and we have jurisdiction to consider this case on the merits.

### III.

█ We review a district court's grant of summary judgment de novo. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 409 (6th Cir.1999). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary

judgment, the evidence, all facts, and any inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)).

## IV.

### A. *Direct Liability*

Supreme Inc. was incorporated under the laws of the State of Tennessee. It is undisputed that the 1988 assessment was entered against Supreme Inc. as a result of the corporation's failure to pay the full amount of its corporate taxes in the tax years 1979, 1980, and 1981. We note, to be perfectly clear, that the 1988 tax assessments did *not* arise from any failure by the Westleys to pay their *personal* income taxes, nor were the Westleys personally assessed for the outstanding tax deficiencies.

■ The shareholders of a corporation are generally not liable for the debts of a properly formed corporation unless the shareholders' own actions create a basis for liability, *e.g.,* conduct that allows a court to pierce the corporate veil. *See* TENN.CODE ANN. § 48–16–203(b) ("A shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the shareholder's own acts or conduct.") While we express no opinion on whether or not the facts of this case would have allowed the district court to pierce the corporate veil between Supreme Inc. and the Westleys, we note that the Government has not even attempted to argue that the corporate veil should be pierced. The Government, therefore, cannot argue that the Westleys are directly liable for the debts of Supreme Inc.

### B. *Transferee Liability*

The Government claims that the Westleys are liable for Supreme Inc.'s back taxes under a "transferee liability" theory. As the Tenth Circuit explained, the transferee's liability "stems from the fact that she holds property as a transferee in which [the transferor's] creditors have an interest because the transfer results in [the transferor's] insolvency." *United States v. Floersch,* 276 F.2d 714, 718 (10th Cir.1960). The nature of this "transferee liability" differs from other types of secondary liability, such as the liability incurred by a co-signer or guarantor of a debt:

> There is no relation between secondary liability, as ordinarily understood, and transferee liability. Secondary liability is a personal liability which may be satisfied from all the assets of the one secondarily liable. Transferee liability, on the other hand, imposes no personal liability. It subjects only the property in the hands of the transferee to the debts of the transferor. It is a proceeding in rem against the property or fund which the transferee received from the transferor burdened with his debts.

*Id.; accord Commissioner v. Henderson's Estate,* 147 F.2d 619 (5th Cir.1945). Because of the in rem nature of transferee liability, the Government is limited to attempting to satisfy Supreme Inc.'s outstanding income tax liability from the property conveyed to the Westleys by Supreme Inc. That the Westleys received cash distributions from Supreme Inc., instead of real property or other tangible property, does not affect our analysis. *See Bowlin v. Commissioner,* 273 F.2d 610 (6th Cir.1960) (upholding tax court decision requiring wife of taxpayer to surrender cash she received from taxpayer's insurance policies because the transfer was a fraudulent conveyance under Tennessee law).

■ The legal underpinning for holding a transferee liable is found in the state law of the relevant jurisdiction. *See Commissioner v. Stern,* 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958). In *Stern,* the United States Supreme Court recognized that the federal courts had, up to that point, followed the applicable state statutes when the Government sought to collect unpaid taxes from persons other than the defaulting taxpayer. In affirming this practice, the Court held "that, until Congress speaks to the contrary, the existence and extent of liability should be determined by state law." *Id.* at 45. Thus, in the absence of a federal statute to the contrary, state law controls the determination of the Westleys' liability.

## C. *26 U.S.C. § 6901*

Congress has not enacted any new, substantive provisions that would alter the practice of referring to state law. The tax code does, however, have one provision that addresses transferee liability. *See* 26 U.S.C. § 6901. Section 6901 allows the Government to invoke a summary procedure for collecting taxes from a transferee; however, the period of limitations for assessing liability against the transferee under § 6901 expires one year after the expiration of the period of limitation for assessment against the transferor. *See* 26 U.S.C. § 6901(c)(1). Because the Government did not timely invoke § 6901, it cannot now proceed under § 6901.

■ However, whether or not the Government invoked § 6901 makes very little difference at this juncture. The *Stern*

court specifically held that 26 U.S.C. § 311, recodified as § 6901, "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Stern,* 357 U.S. at 42. Thus, while the timely invocation of § 6901 might have assisted the Government in its collection efforts against the Westleys,[2] the Government's failure to proceed under that section does not vitiate the substantive liability of the transferees if such liability exists under state law. *See Hall v. United States,* 403 F.2d 344 (5th Cir.1968) (distinguishing an action under § 6901 from an action in rem to set aside a fraudulent conveyance ancillary to collecting a judgment against the taxpayer-transferor); *see also Kaiser v. Stedman,* 1999 U.S. Dist. LEXIS 15327, at *40, 1999 WL 810445 (S.D.Ohio Sept. 9, 1999) (noting that the Government did not proceed under § 6901 and holding that the action to set aside the fraudulent conveyances of certain real property is "an in rem action to set aside fraudulent conveyances of property rather than an in personam action to make the transferees personally liable").

## D. *Fraudulent Conveyance*

The Government's only cause of action against the Westleys is found in the laws of the state where the distribution to the Westleys occurred. The Government alleges that Supreme Inc., a Tennessee corporation, fraudulently conveyed its assets to the Westleys, also residents of Tennessee, to avoid paying its taxes. Thus, the Uniform Fraudulent Conveyance Act ("UFCA") of Tennessee controls.[3]

---

2. Because the Government did not proceed under § 6901, we express no opinion regarding any possible effects § 6901 would have on the outcome of this case, nor do we express any opinion on whether the nature of the proceeding would be different if the Government had invoked § 6901.

3. The relevant portions of Tennessee's UFCA follow:

TENN.CODE ANN. § 66–3–305. Conveyances by insolvent without fair consideration declared fraudulent. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard

In a recent, unpublished opinion, the district court in the Eastern District of Tennessee considered Tennessee's version of the UFCA in precisely this context. *See United States v. Freudenberg*, 1999 WL 501006 (E.D.Tenn. June 9, 1999). The district court's discussion is instructive:

> Where a taxpayer has allegedly fraudulently transferred his property prior to the filing of federal tax liens, the United States may seek relief under the applicable fraudulent conveyance laws of the state in which the property is located. *See, Commissioner v. Stern*, 357 U.S. 39, 45, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); and *United States v. Westley*, 1998 WL 427375 (W.D.Tenn.). Thus, Tennessee's law applies to this case:
>
> \* \* \* \* \* \*
>
> ■ The plaintiff must prove fraud (actual or constructive) by a preponderance of the evidence. *James v. Joseph, et al*, 156 Tenn. 417, 1 S.W.2d 1017, 1019 (1928); *Middle Tenn. Electric Membership Corp. v. Neely*, 1988 WL 85342 (Tenn.Ct.App.1988); *United States v. Kerr*, 470 F.Supp. 278, 281 (E.D.Tenn. 1978). However, if there are "badges of fraud" which cast suspicion on the transaction, the burden of proof shifts to the

defendant to explain the transaction and show that it was not fraudulent. *Stevenson v. Hicks*, 176 B.R. 466 (Bkrtcy. W.D.Tenn.1995), listed a number of "badges of fraud" identified over the years by the Tennessee appellate courts: The transferor is in a precarious financial condition; he knew there was or soon would be a large money judgment rendered against him; inadequate consideration was given for the transfer; secrecy or haste existed in carrying out the transfer; a family or friendship relationship existed between the transferor and the transferee; the transfer included all or substantially all of the transferor's nonexempt property; the transferor retained a life estate or other interest in the property transferred; the transferor failed to produce available evidence explaining or rebutting a suspicious transaction; and there was a lack of innocent purpose or use for the transfer. *See*, 176 B.R. at 470.

*Freudenberg*, 1999 WL 501006, at *2. Thus, under Tennessee law the intent to defraud can be either actual or constructive. If the court finds either actual or constructive intent, the conveyance is de-

---

to such person's actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

TENN.CODE ANN. § 66–3–308. Conveyances with intent to defraud. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors.

TENN.CODE ANN. § 66–3–302. Test for insolvency. A person is insolvent when the present fair salable value of the person's assets is less than the amount that will be required to pay the probable liability on such person's existing debts as they become absolute and mature.

TENN.CODE ANN. § 66–3–304. "Fair consideration" defined. Fair consideration is giv-

en for property, or obligation: (1) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; ...

TENN.CODE ANN. § 66–3–310. Remedies of creditor on matured debt. Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when the claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser: (1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy the creditor's claim; or (2) Disregard the conveyance and attach or levy execution upon the property conveyed.

clared fraudulent, and the remedies of § 66–3–310 are available to the Government.

In this case, the district court concluded that the liquidation of Supreme Inc.'s assets and distribution of those assets to the Westleys was a fraudulent conveyance. The district court based that conclusion both on constructive intent, because the liquidation left Supreme Inc. unable to pay its outstanding tax liability, and on actual intent, because the transaction bore several of the "badges of fraud" that throw suspicion on a transaction.

■ The Westleys do not contest the district court's finding of constructive fraud. They, in fact, concede that the distribution from Supreme Inc. to the Westleys left the corporation insolvent. Thus, under Tenn.Code. Ann. § 66–3–305, this conveyance was fraudulent. The Westleys do, however, argue that the district court's finding of actual fraud under Tenn.Code. Ann. § 66–3–308 was erroneous because they made provisions for payment of the taxes in the creation of the Supreme Partnership. But, even if the district court erred in finding actual intent, that error is harmless because a fraudulent conveyance under either § 66–3–305 or § 66–3–308 is sufficient to set aside the transfer of property from Supreme Inc. Because the distribution of assets from Supreme Inc. to the Westleys left the corporation unable to pay its taxes, it was, by definition, a fraudulent conveyance under Tennessee law, and the district court did not err in so holding.

**4.** Specifically, the Westleys contend that the Government has a legal remedy against the Supreme Partnership under contract law because the Supreme Partnership agreed to assume the tax liability when it accepted the assets. Other than an inference that may be argued from Supreme Partnership's financial

### E. Collection of Supreme Inc.'s Taxes

The Westleys focus the bulk of their arguments on reasons why they believe the Government should be precluded from recovering in this case. First, the Westleys argue that the Government is precluded from pursuing the equitable remedy of setting aside the fraudulent conveyance because the Government has not exhausted all remedies at law. Citing to a Sixth Circuit case, *Hyde Properties v. McCoy*, 507 F.2d 301 (6th Cir.1974), they argue the Government should be precluded from pursuing the Westleys in equity because the Government failed to exhaust all the remedies available to it at law, namely, invoking the summary procedure of 26 U.S.C. § 6901 against the Westleys, exhausting all legal remedies against the Supreme Partnership,[4] and failing to seize any of Supreme Inc.'s assets that may be in the hands of subsequent transferees.

The Westleys' reliance upon *Hyde Properties* is misplaced. In that case, Hyde Properties had purchased some property from a corporation undergoing financial difficulties. The corporation was falling behind with all of its creditors, including the federal government. The corporation decided to sell a building it owned to Hyde Properties. Hyde Properties partially paid for the building by executing two $25,000 promissory notes. One of the corporation's shareholders, a Mr. McCoy, wanted to sell his interest in the corporation, so the corporation redeemed McCoy's interest in exchange for the Hyde Properties' promissory notes. Just before the notes became due, the Government sought to levy against the notes to satisfy the

statements, there is no evidence whatsoever of a contract between Supreme Inc. and the Supreme Partnership regarding the payment of the corporation's tax liability. Because the Westleys have failed to prove the existence of any such contract, we find this argument irrelevant to the question before us.

corporation's unpaid taxes, arguing that the conveyance to McCoy was fraudulent. Hyde Properties filed an interpleader action because it was unsure whom to pay–Mr. McCoy or the federal government. The jury determined that the conveyance was not fraudulent. However, the district court granted the government's motion for JNOV and ordered that the funds be handed over to the government. McCoy appealed from this ruling, arguing that he had been deprived of his right to a jury trial. In analyzing the question, we concluded that the threshold issue was whether McCoy was entitled to a jury trial under the Seventh Amendment. *See id.* at 304. It is within this context that we held:

> A creditor under Tennessee law has two possible remedies for a fraudulent conveyance—he can have the transfer set aside or annulled, or he can ignore the conveyance and levy an execution upon the property. The first alternative is exclusively within the power of equity. The second option is a legal remedy based on the theory that a fraudulent conveyance, though valid between the parties, is void as to creditors. Because such a transfer is void, a court of law may grant a creditor either a levy of attachment or execution. Although a creditor has a choice of proceeding either at law or in equity, we are of the view *that for the purposes of determining a right to a jury trial* the creditor must proceed at law unless such a remedy is inadequate. Without this requirement, it is clear that a creditor could decide to pursue his relief in equity and, thereby, deny to his adversary the right to a jury under the Seventh Amendment. To prevent a party from thus controlling the constitutional rights of his opponent, the legal remedy must be inadequate before the equitable means of redress can be employed.

*Id.* at 305–06 (internal citations omitted and emphasis added).

■ The Westleys' argument that the government cannot pursue them under a fraudulent conveyance theory stretches the holding of *Hyde Properties* too far. The Westleys quote *Hyde Properties* out of context–this case does not present the question of the Westleys' right to a jury trial–and their argument is without merit. *See also United States v. Perrina*, 877 F.Supp. 215 (D.N.J.1994) (holding that the government's failure to proceed under 26 U.S.C. § 6901 did not bar the government's right to recoup from the transferee the value of assets fraudulently transferred by the tax debtor).

The Westleys' second and third arguments are intertwined with the undisputed fact that they reinvested the distribution from Supreme Inc. into the Supreme Partnership. They argue that under Tennessee's UFCA, the government is limited to two remedies–to set aside the transfer or to levy against the actual property transferred. *See* TENN.CODE. ANN. § 66–3–310; *see also Freudenberg*, 1999 WL 501006, at *3. Therefore, they say, the government cannot obtain a money judgment from them because that remedy is not available under the Tennessee UFCA. Finally, the Westleys argue that any liability they might have had as a result of receiving the property from Supreme Inc. was a debt discharged in their 1994 bankruptcy case.

1. *The nature of the debt.* The Government argues that, as transferees of a fraudulent conveyance, the Westleys are personally liable for Supreme Inc.'s unpaid taxes. Therefore, the Government contends, the debt is one for a tax that is not dischargeable in bankruptcy. We disagree.

■ The transferee of fraudulently conveyed property can be compelled to return the property to satisfy the transferor's outstanding tax debts, but he does not

assume the role of the taxpayer. Commentator Laurence Casey explains, "The transferee is not a debtor for the taxpayer's liability; he is by virtue of receipt of property of the taxpayer, subject to an independent liability in his own person, payable out of his own estate, under the trust fund doctrine and similar theories." 4 Laurence F. Casey, *Casey Federal Tax Practice* § 12.4 (1995). Our sister circuits, when faced with this issue have held that transferee liability is not personal liability for the tax, but rather, a proceeding *in rem* against the transferred property. *See Commissioner v. Henderson's Estate*, 147 F.2d 619, 620–21 (5th Cir.1945); *United States v. Floersch*, 276 F.2d 714, 717 (10th Cir.1960).

The reason for this distinction is important. If the Government were allowed to attach the personal assets of the Westleys to satisfy the tax debts of a corporation from which they received a transfer of property, that action would be tantamount to holding the Westleys, as shareholders, personally liable for the tax debts of the corporation. Such a result is plainly improper. *See DeWest Realty Corp. v. I.R.S.*, 418 F.Supp. 1274, 1279 (S.D.N.Y. 1976) ("To allow the government to levy against the transferee's personal property or any property not conveyed by the transferor (Realty) would completely distort the meaning of 'extent' as interpreted by state law, eliminate the effect of the *Stern* decision, and essentially convert transferee liability into personal liability for the tax debts of another. Such a result is at odds with case law and commentary, and indeed, would raise serious constitutional problems.")

■ We therefore conclude that, as transferees of Supreme Inc.'s assets, the Westleys' obligation to the Government is a personal debt in the amount of the property they received from Supreme Inc. Thus, the question becomes whether the

Westleys' debt was discharged in the 1994 bankruptcy proceedings.

2. *Discharge in bankruptcy.* Ten years after receiving the fraudulent conveyance from Supreme Inc., the Westleys filed a Chapter 7 bankruptcy petition. As a result of those proceedings, the bankruptcy court granted the Westleys a discharge under 11 U.S.C. § 727 on May 2, 1994. It is undisputed that the Westleys did not list the Government as a creditor in the schedules filed in the bankruptcy petition. It is also undisputed that when the Westleys became aware of the Government's claim, they filed a motion in the bankruptcy court to reopen their case, and obtained an order stating:

> It is therefore ordered and notice is hereby given that the debtor(s)' instant motion is granted, that the creditor(s) shown at the bottom of this order (or attachment) [the Internal Revenue Service] is/are added to the debtor(s)' schedules and that such creditor(s) shall have until August 18, 1997 to file any objections to determine dischargeability that may be required to be to be filed under 11 U.S.C. § 523(c) (and/or any complaints objecting to discharge of the debtor(s) under 11 U.S.C. § 727(a)). In the absence of filing such complaint(s), after the expiration of the deadline, the debtor(s) shall be entitled to a discharge of the added debt(s), unless a debt is of a type not addressed by a routine chapter 7 discharge, in which event either the debtor(s) or the affected creditor(s) may file an appropriate complaint to determine dischargeability.

*See In re Westley*, No. 94–200005–B, (Bankr.W.D. Tenn. June 6, 1997) (order granting debtors motion to amend schedule to add creditor). Finally, it is undisputed that the Government filed nothing in the bankruptcy court in response to that order.

The district court held that the Westleys' debt had not been established prior to the discharge in bankruptcy because the debt did not exist until the district court entered its order of June 17, 1998, holding that a fraudulent conveyance had in fact occurred. We disagree. The transfer of property from Supreme Inc. to the Westleys occurred in 1984, 10 years before the Westleys filed bankruptcy. The obligation to return the property arose when the fraudulent transfer occurred; the district court's order of June 17, 1998, merely made that obligation enforceable through the courts. *See* 11 U.S.C. § 101(5)(A) ("In this title–'claim' means–(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; . . .")). Because the claim existed prior to the Westleys filing for bankruptcy, it was subject to discharge in the 1994 bankruptcy action.

A section 727 discharge forgives all debts that are not excepted under section 523. In pertinent part, section 523 provides as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit–

(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

\* \* \* \* \* \*

(c)(1) Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), (6), or (15) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), (6), or (15), as the case may be, of subsection (a) of this section.

The Government contends that because the Westleys' debt is the result of a fraudulent conveyance, it falls within the exceptions to discharge set forth in § 523(a)(2), (4) or (6)–which we shall refer to, for ease of reference, as "fraudulently incurred debts"–a contention which is undisputed here. However, the Government further contends that because this is a fraudulently incurred debt, it is not dischargeable.

As we shall explain, the Government is mistaken.

The Westley's debt is described by section 523(a)(3)(B). That is, it is unlisted, and of a kind specified in paragraphs (2), (4) or (6) of section 523(a). We recognize that there is a danger in converting the "exception to the exception" language of section 523 into a simple statement of what that language affirmatively provides, but we are willing to take the risk. With regard to fraudulently incurred debts, section 523 provides that even unlisted fraudulently incurred debts will be discharged if the creditor obtains notice or actual knowledge of the bankruptcy in time to file a proof of claim and a request for determination of dischargeability. *See* 11 U.S.C. § 523(a)(2), (3)(B), (4), (6) and (c)(1).

■ In a recent case, this court held that the bankruptcy court did not err in refusing to reopen a Chapter 7 no-asset case to permit the debtor to amend his schedules to add a previously omitted debt of the kind described in section 523(a)(3)(A). *See Zirnhelt v. Madaj (In re Madaj),* 149 F.3d 467, 470 (6th Cir.1998). In a Chapter 7 no-asset case, we explained, there is typically no deadline for filing a proof of claim; *see* Fed. R. Br. P. 2002(e); hence, "there is no date by which a proof of claim must be filed in order to be 'timely.' Whenever the creditor receives notice or acquires actual knowledge of the bankruptcy, he may file a proof of claim, [and] that claim will be timely." *In re Madaj,* 149 F.3d at 469. We went on to explain that "[b]ecause § 523(a)(3)(A) excepts the unscheduled debt from discharge 'unless such creditor had notice or actual knowledge of the case in time for such timely filing,' the moment the creditor receives notice or knowledge of the bankruptcy case, § 523(a)(3)(A) ceases to provide the basis for an exception from discharge. Consequently, the debt is at that point discharged." *Id.* at 470. Although *Zirn-*

*helt* involved a debt described in section 523(a)(3)(A)–unlisted debts other than fraudulently incurred debts–*Zirnhelt's* holding that in a Chapter 7 no-asset case there is no date by which a proof of claim must be filed in order to be timely applies as well to debts described in section 523(a)(3)(B)–fraudulently incurred debts. Both sections provide that if the creditor receives notice or obtains actual knowledge of the bankruptcy in time to file a proof of claim, the unlisted debt will not be excepted from discharge; section 523(a)(3)(B) further provides that if the creditor holding an unlisted fraudulently incurred debt receives notice in time to file a request for determination of dischargeability, even that debt will not be excepted from discharge.

The ultimate holding in *Zirnhelt,* however, was that because it was undisputed that the debt at issue was not otherwise nondischargeable, that is, "the debt at issue, had it been timely filed, would not have been included in any category of debts that are excepted from discharge by § 523," *id.* at 472, reopening the bankruptcy case to permit the late scheduling of that debt would have no effect whatever on the discharge. We reasoned:

If the Creditors before us had acquired knowledge of the bankruptcy prior to the entry of the discharge order, the debt would not have been excepted from discharge because the Creditors had actual knowledge in time to file a proof of claim. Their learning of the bankruptcy after the entry of the discharge order did not transmogrify the debt into one that is excepted from discharge under some provision of the Code other than § 523(a)(3)(A). Whether or not the Debtors reopen their case and amend their schedules to list this debt, there will still be no date by which proofs of claim would have to be filed in order to be timely; because the Creditors have

actual knowledge of the bankruptcy, § 523(a)(3)(A) does not except this debt from discharge. Hence, the reopening of the Debtors' Chapter 7 case to permit the amendment of the schedules can have no effect whatsoever. The debt in question, listed or not, is discharged. *Id.*

Our ultimate holding in *Zirnhelt* dealt only with debts not otherwise nondischargeable–that is, debts described in section 523(a)(3)(A)–and we were careful in that case to distinguish debts that, had they been timely filed, would have fallen into a category of debts that are excepted from discharge by section 523. Fraudulently incurred debts–that is, debts of the kind specified in paragraphs (2), (4) and (6) of section 523(a)–are specifically excepted from discharge except as provided in section 523(a)(3)(B). The Westleys' debt is such a debt.

■ Under the reasoning of *Zirnhelt*, it would not be error for a bankruptcy court to permit a debtor to reopen his case and amend his schedules to list a previously omitted debt of the kind described in section 523(a)(3)(B). In the Westleys' case, the bankruptcy court did exactly that, and sent the Government notice that the debt had now been scheduled, and that the Government had a specific time within which to file a proof of claim and a request for a determination of dischargeability. Section 523(c)(1) provides that even previously unlisted debts of the kind specified in paragraphs (2),(4) and (6) of section 523(a) will be discharged unless, on request of the creditor, the court determines that those debts are excepted from discharge. The bankruptcy court's order is clear–it placed the burden on the Government to request a determination of dischargeability within the time frame provided or lose its ability to collect upon the debt at all. *See also Mead v. Helm*, No. 88–1015, 1989 WL 292, at *5 (6th Cir., Jan. 4, 1989) ("[A] creditor must initiate bankruptcy court proceedings to determine the dischargeability of a debt under section 523 of the Code. If the creditor fails to act, the debt is discharged pursuant to section 523(c) of the Code.") Consistent with its pattern throughout the long history of this disputed liability, the Government simply failed to take any action at all. Indeed, to this very day the Government has never attempted to request a determination of dischargeability of this debt, and it clearly would be barred from doing so now.

3. *Money Judgment.* The final issue raised by the parties is whether the district court could enter a money judgment against the Westleys to remedy the fraudulent conveyance because the actual property of Supreme Inc. is no longer in the hands of the Westleys. We note at the outset that the district court order before us is limited to setting aside the fraudulent conveyance; although the district court did issue an order for a money judgment, that order was later rescinded, and the original judgment was restored *nunc pro tunc.* While it appears that Tennessee law would allow for the imposition of a money judgment under these circumstances, *see, e.g., Orlando Residence, Ltd. v. Nashville Lodging Co.,* No. 01A–01–9606–CH–00256, 1996 WL 724915 (Tenn.Ct.App. Dec. 18, 1996), we do not need to reach that question because whatever obligation the Westleys may have had to return property or pay money back to Supreme Inc., has been discharged in their Chapter 7 bankruptcy proceeding.

## CONCLUSION

As a final comment, we note that the precedential value of this opinion is limited by the peculiar facts presented in this appeal. We wish to make perfectly clear that transferees such as the Westleys–those who receive property from a taxpay-

er who has fraudulently transferred assets for the purpose of evading the payment of taxes–can be compelled to return the property to the transferor to satisfy the transferor's tax obligation. And, in states with laws like those of Tennessee, the transferee is liable even in the absence of actual fraudulent intent by the taxpayer if the conveyance leaves the transferor insolvent. The result we reach today is the direct result of the fact that Supreme Inc.'s property is no longer in the hands of the debtors, and their personal debts have been discharged in bankruptcy. The Government has an arsenal of tools available to collect outstanding taxes; in this case, it simply chose not to use those tools until the debt, through the natural course of events, became uncollectible.

For the foregoing reasons, we AFFIRM the district court's holding, on summary judgment, that Supreme Inc.'s conveyance of assets to the Westleys was fraudulent. However, we REVERSE the district court's conclusion that the Westleys' debt was not discharged in bankruptcy and REMAND this case to the district court for entry of an order that the Westleys' debt arising out of the fraudulent conveyance was included in their Chapter 7 discharge.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

While I agree with much of the majority opinion, I am unable to concur in full because I am persuaded that the debt here is for a tax and, therefore, not dischargeable in bankruptcy under 11 U.S.C. § 523 even though no claim was filed.

Tenn.Code Ann. § 66–3–310 permits the creditor of an insolvent person or corporation to proceed against property conveyed to another individual or entity without consideration while the debtor was insolvent.[1] Further Tennessee law permits a judgment against the creditor when the property has been reduced to cash. Applying Tennessee law, we affirmed the tax court when it required the wife of a taxpayer to surrender cash she received from the taxpayer's insurance policies because the transfer was a fraudulent conveyance. *See Bowlin v. Comm'r of Internal Revenue,* 273 F.2d 610 (6th Cir.1960); accord *Vance v. McNabb Coal & Coke Co.* 92 Tenn. 47, 20 S.W. 424 (1892) (holding that a creditor of insolvent corporation was permitted to sue purchasing corporation which permitted insolvent corporation to distribute assets to shareholders without payment of selling corporation's debt.)[2] Thus, I agree

---

1. Tenn.Code Ann. § 66–3–310 states

 Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when the claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser:

 (1) Have the conveyance set aside or obligation ammulled to the extent necessary to satisfy the creditor's claim; or

 (2) Disregard the conveyance and attach or levy execution upon the property conveyed.

2. The principle that a creditor in Tennessee may pursue the insolvent corporation's assets in the hands of anyone who is not a purchaser for fair consideration is restated in dicta in *Jennings, Neff & Co. v. Crystal Ice Co.,* 128

Tenn. 231, 159 S.W. 1088 (1913), and applied in circumstances where a corporation purchasing another corporation and taking over all its assets rendering it insolvent failed to pay the debts of the other corporation.

 The doctrine that corporate assets are a trust fund, at least to the extent that creditors are entitled to equity to payment of their debts before any distribution of corporate property is made among stockholders, is fully established in Tennessee, and creditors have a right to follow its assets or property into the hands of anyone who is not a holder in good faith in the ordinary course of business.

 As such, the purchasing corporation holds the property so acquired impressed with the same trust with which said property was originally charged, and the purchasing corporation is liable to the creditors of the

with the majority that the fact they received the insolvent's property in cash rather than in kind does not affect the debtor's right to recovery.

But I cannot agree that the debt is for fraud and, therefore, dischargeable. Because it is a claim for a tax, I would hold defendants liable to the extent each individually received assets from the insolvent corporation. While it is true that the district court found that the corporation was insolvent and its conveyance of the property to defendants was a fraudulent conveyance, that finding was necessary only to identify that it was the corporation's property and to determine the amount each defendant received. The debt on which the United States makes its claim is a debt for the corporation's tax. Its right to recover from defendants is because of that debt. Were we dealing with tangible property fraudulently conveyed to defendants and the same scenario of an action in equity to set aside the transfer, it would be easier to recognize that the debt is for the tax, not a personal claim against the transferee for fraud. The transferee is only liable for the amount of the insolvent's property transferred while insolvent. Indeed, the transferee would be liable even if not guilty of fraud. The insolvent corporation could transfer assets to innocent shareholders who knew nothing about its insolvency. The creditor would nonetheless be entitled to set aside the transfer as a fraud of creditors without any fraud on the part of the intended shareholder. The fraud would be by the corporation. Yet the creditor would be able to recover the money or property transferred by the insolvent corporation.

Transferee liability is an action against the transferred property, as the majority points out. (Majority Opinion ¶ 50.) The creditor seeks to recover only the property

selling corporation to the extent of the value of the property thus obtained.

conveyed by the insolvent corporation. The United States, in its capacity as a creditor of the insolvent corporation, seeks a money judgment only for the amounts transferred to defendants by the insolvent corporation in its capacity as a creditor of that corporation. While the district court made a finding that defendants were guilty of actual fraud in that they intended to evade the corporation's taxes, that finding was not essential to the government's right as creditor to recover the corporation's property transferred to them while the corporation was insolvent.

The debt here is the debt of the corporation for a tax. The property from which the government seeks to recover the tax is the property of the corporation. As a debt for tax, it has not been discharged.