NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0839n.06

No. 11-1428

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Aug 06, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| GEORGINA M. PORATH and GORDON | ) | EASTERN DISTRICT OF MICHIGAN |
| H. PORATH, | ) | |
| | ) | |
|     Defendants-Appellants. | ) | |

Before: GIBBONS, ROGERS, and COOK, Circuit Judges.


JULIA SMITH GIBBONS, Circuit Judge. Defendants-appellants Georgina Porath and Gordon Porath appeal from the district court's judgment following a one-day bench trial. The district court found that the United States was entitled to attach a federal tax lien to Mr. Porath's interest in one-half of the property in order to satisfy his unpaid tax obligations. The Poraths argue that the district court erred by (1) concluding that a 1987 postnuptial agreement between the Poraths did not demonstrate a present intent to convey Mr. Porath's interest in the marital home to Mrs. Porath and (2) determining that the 1991 transfer of the marital property from Mr. Porath to Mrs. Porath via a quitclaim deed was carried out in order to hinder the collection of a debt. For the reasons that follow, we affirm.

1

I.

The Poraths have been married since 1942 and have lived together in a house in Brighton, Michigan (the "Brighton property") for more than forty years. In the late 1980s, Mr. Porath decided to leave his employer, Midwest Boutiques, to go into the computer business. Midwest Boutiques owned U.S. Computer Corporation and U.S. Computer Chicago. An arrangement was made under which Mr. Porath forgave a debt owed to him by Midwest Boutiques and took over a loan that Midwest Boutiques had made to the two computer companies. Mr. Porath became the majority shareholder and vice president of U.S. Computer Corporation. At the same time, Mr. Porath decided that he needed to put more money into U.S. Computer to ensure that the company had enough working capital to be successful. Mrs. Porath was initially opposed to investing the couple's funds in the computer business.

The Poraths testified that, after discussing the matter, they decided that Mr. Porath could use the money the couple had available: Mr. Porath would sell his half of the Brighton home to Mrs. Porath in exchange for the money needed for the business. The Poraths drafted and signed an agreement which set forth their arrangement. The agreement, dated July 9, 1987, provided in relevant part:

> Dear Georgina,
>
> As of July 31, 1987, I will discharge the debt owed to me by Midwest Boutiques, Inc. in exchange for Midwest Boutiques, Inc. assigning its loan receivable from U.S. Computer Corporation to me and 100% of the outstanding shares of capital stock of U.S. Computer Corporation to me. At the same time with the assignment, I will acquire 100% of the outstanding shares of capital stock of U.S. Computer-Chicago, Inc. Next, I will distribute 49% of the outstanding shares of stock in U.S.

> Computer Corporation to Dominic Morinelli to fulfil[l] an oral promise made by me to Dominic Morinelli. The remaining 51% of the outstanding shares of stock in U.S. Computer Corporation, I will issue to myself.
>
> We both recognize this move carries a high risk; and, further, you have stated your opposition to the venture. To use your words, "At our age, I am not going to stand by and watch 45 years of stress and toil go down the drain."
>
> We agree that for your protection (and mine), whenever you desire you may transfer to yourself any and all assets that we hold jointly. This right includes, but is not limited to, transferring to your name [the Brighton property], its buildings and contents and all and any bank accounts, securities, security accounts, and money market accounts, which we agree is fair consideration for your share of the assets we have accumulated.

R.14-6, PageID 292. After signing the agreement, Mr. Porath wrote four checks totaling $65,000.00 from a jointly held Merrill Lynch cash management account[1] to U.S. Computer as loans from Mr. Porath to the company. The Poraths testified that they believed that Mrs. Porath became the sole owner of the Brighton property on July 9, 1987.

Although they signed the agreement in 1987, the Poraths did not publicly record it until January 1991. Mr. Porath testified that he approached his lawyer, Robert Litt, in December 1990, after Mrs. Porath asked whether there were any problems with the fact that both she and Mr. Porath were engaging in commodities trading out of the Brighton property. Litt drafted a quitclaim deed to reflect the agreement between the Poraths. The deed recited that Mr. Porath quitclaimed the

---

[1]Although the checks came from a joint account, Mrs. Porath also had individual accounts in her name at the time the checks were issued to U.S. Computer. She reported having an individual account with Merrill Lynch with $60,000.00, a security account with $35,000.00, and an IRA with $13,000.00 in it.

Brighton property to Mrs. Porath "for the full consideration of one dollar," and was signed before a notary on January 25, 1991, and recorded with the register of deeds on January 31, 1991.

U.S. Computer Corporation dissolved in 1989. U.S. Computer Corporation failed to remit to the Internal Revenue Service ("IRS") income and social security taxes withheld from employee wages in 1988 and 1989. Mr. Porath testified that he learned that U.S. Computer had not been paying employment taxes by the late part of 1989. Mr. Porath also testified that by late 1990 he had seen notices from the IRS indicating that U.S. Computer had failed to pay its employment taxes and that he was interviewed in 1990 by a revenue officer regarding a trust fund recovery penalty investigation. On October 28, 1991, an assessment was made against Mr. Porath for a trust fund recovery penalty under 26 U.S.C. § 6672 in the amount of $66,961.58. Mr. Porath received notice of the assessment and a demand for payment. On January 17, 1991, a certified public accountant filed a protest on behalf of Mr. Porath in the penalty proceeding. In March 1994, judgment was entered in favor of the United States regarding the trust fund recovery penalty assessed against Mr. Porath.

After the 1994 judgment was entered, a notice of a federal tax lien against Mr. Porath was recorded with the Livingston County Register of Deeds on August 29, 1995. The notice of federal tax lien against Mr. Porath was refiled with the Register of Deeds on January 19, 2001. In June 2004, a notice of federal tax lien was recorded against Georgina Porath as a nominee or transferee of Gordon Porath.

On January 11, 2008, the United States filed a complaint against Gordon and Georgina Porath seeking to foreclose a federal tax lien associated with an unpaid federal tax assessment against Gordon Porath, stemming from the trust fund recovery penalty assessed against him. The United States alleged that the tax lien had attached to the Brighton property. As of September 1, 2008, the assessment had not been paid in full and, including interest and statutory additions to the assessment, $232,634.16 remained due to the United States. In its effort to collect the taxes owed, the United States sought to set aside as fraudulent a transfer of the record title interest in the Brighton property from Mr. Porath to Mrs. Porath, which was made by quitclaim deed in 1991, and requested that the district court determine that the federal tax lien attached to the Brighton property and order the property sold with an appropriate portion of the net proceeds to be applied towards the unpaid tax assessment.

In response to the complaint filed by the United States in 2008, Mrs. Porath filed a compulsory counterclaim to quiet title. Mrs. Porath alleged that (1) the federal tax liens issued as to Gordon Porath's interest in the Brighton property were invalid because he possessed no legal or equitable ownership in the property at the time the lien was assessed because he had conveyed his interest in the property to Mrs. Porath under the terms of their July 1987 agreement, and (2) the lien recorded in June 2004 cast a cloud on the marketable title of the Brighton property.

The district court conducted a one-day bench trial on April 7, 2009. On February 3, 2011, the district court issued an opinion and order which dismissed the Poraths' counterclaim and entered judgment in favor of the United States. The district court found that the 1987 letter agreement did

5

not operate to effect an immediate transfer of Mr. Porath's interest in the property to Mrs. Porath because the "language in the letter is far from unconditional and it does not bespeak of a *present* intent to transfer the Brighton property." Instead, the court found that the letter indicated that Mrs. Porath had *permission* to transfer the assets listed and could choose to exercise her right to do so "whenever [she] desire[d]." The district court concluded that the federal tax lien attached to the Brighton property because the 1991 transfer was a fraudulent conveyance made with the intent to hinder the collection of the tax obligation, in violation of Michigan Compiled Laws § 566.17. The district court found Mr. Porath's justification for seeking to register the transfer of interest in the Brighton property in 1991 "unconvincing" because "[t]he legalities of operating a business from a residence do not depend on the name of the record title holder, and according to [Mr. Porath's] explanation, [Mrs. Porath] was trading in commodities on her own account as well." Instead, the district court found that Mr. Porath's knowledge of his potential tax liability due to U.S. Computer's failure to remit the employment taxes was the more likely explanation for the 1991 recording of the deed as an effort to "place it beyond the reach of creditors, most notably the IRS." In light of its findings, the district court held that the United States could look to Mr. Porath's one half share of the Brighton property to satisfy his unpaid tax obligations by enforcing its lien through foreclosure when the Poraths terminate their occupancy of the home or default in payment of property taxes or fail to maintain casualty insurance.[2] The Poraths timely appealed.

---

[2]The United States's post-trial brief requested the district court order foreclosure of the United States's federal tax lien against Mr. Porath's interest in one-half of the Brighton property, but agreed that as long as real estate taxes were paid and insurance maintained on the property it would not execute on the judgment while either Mr. or Mrs. Porath remained in the Brighton home.

II.

"We review a district court's legal conclusions following a bench trial *de novo*." *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008). The district court's findings of fact are reviewed under the clearly erroneous standard. *Id.*

III.

"The tax code provides for federal tax liens through 26 U.S.C. § 6321." *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). That section provides for a statutory lien "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand . . . ." 26 U.S.C. § 6321. The lien in favor of the United States includes "the amount [of tax owed] (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto)" and attaches to "all property and rights to property, whether real or personal, belonging to such person." *Id.* A federal tax lien does not "attach to property in which a person has no interest under state law." *Spotts*, 429 F.3d at 251; *see also Drye v. United States*, 528 U.S. 49, 58 (1999) (explaining that court must first look to state law to determine the taxpayer's rights in the property the Government seeks to reach and then consult federal law "to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation"). Thus, in order to determine whether the federal tax lien attached to the Brighton property, it is necessary to determine first whether, under Michigan law, Mr. Porath transferred his interest in the property to Mrs. Porath under either the 1987 postnuptial agreement or the 1991 quitclaim deed.

7

Under Michigan law, "[a] contract for the transfer of real property is valid and enforceable if the agreement contains the essential elements of a contract with sufficient certainty and definiteness regarding the parties, property, consideration, terms, and time of performance." *MacRitchie v. Plumb*, 245 N.W.2d 582, 584–85 (Mich. Ct. App. 1976). In order to effectively transfer title, a deed must demonstrate an intent to make a present conveyance of title. *In re Wetzel*, No. 270809, 2008 WL 681877, at *3 (Mich. Ct. App. Mar. 13, 2008) (*per curiam*) ("'[T]he test of conveyance is whether it can be said that delivery of the deed was such as to convey a present interest in the land.'" (quoting *Wandel v. Wandel*, 57 N.W.2d 468, 471 (Mich. 1953))); 7 Mich. Civ. Jur. Deeds of Conveyance § 23 (updated Feb. 2012). Conveyances of land "may be made by deed, signed and sealed by the person from whom the estate or interest is intended to pass, being of lawful age, or by his lawful agent or attorney, and acknowledged or proved and recorded as directed in this chapter, without any other act or ceremony whatever." Mich. Comp. Laws § 565.1.

The Poraths contend that the execution of the July 9, 1987 postnuptial agreement effectively and immediately transferred Mr. Porath's interest in the Brighton property to Mrs. Porath and that the district court erred by failing to consider extrinsic evidence that they contend demonstrates such an intent. This argument is unpersuasive.

The July 1987 agreement states that "We agree that for your protection (and mine), *whenever you desire* you may transfer to yourself any and all assets that we hold jointly." R. 14-6, Page ID 292 (emphasis added). The terms of the letter itself do not indicate that Mr. Porath intended to presently and unconditionally convey his interest in the Brighton property. Instead of stating that Mr. Porath

8

was unconditionally transferring his interest to Mrs. Porath, the letter instead gives Mrs. Porath permission to transfer the property interest to herself whenever she desires. In other words, the terms of the agreement suggest that Mrs. Porath needed to take an additional step, beyond signing the letter itself, of deciding to exercise her right to transfer assets. Although the word "whenever" suggests a lack of temporal restriction, it does not suggest that Mr. Porath's interest was immediately transferred. The transfer could occur at any time, but Mrs. Porath needed to desire to make the transfer and then to obtain the transfer of interest. Further, although the agreement states that Mrs. Porath "may transfer to [her]self" any of the assets jointly held by the couple, it is clear that her decision to effectuate a transfer would require Mr. Porath's participation—she would have to inform him that she was exercising her rights under the agreement and he would then agree to transfer his interest in the property.

The Poraths contend that this court should look beyond the terms of the 1987 agreement and consider extrinsic evidence when analyzing whether the 1987 agreement transferred Mr. Porath's interest in the Brighton property. Under Michigan law, a court may not consider extrinsic evidence if the contractual language is clear and unambiguous. *See City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005); *Holmes v. Holmes*, 183 N.W. 784, 786 (Mich. 1921) (confining analysis to language of deed). The Poraths argue that because they are "lay persons and do not possess specific knowledge of legal terminology," the terms of the agreement are ambiguous. They further argue that because the word "may" has multiple definitions, which include "a contingency" and "permission and power," the agreement's terms are ambiguous. However, even

9

if the word "may" were construed to mean "permission and power," there would still be no ambiguity necessitating a resort to extrinsic evidence. Giving Mrs. Porath "permission and power" to transfer is not equivalent to expressing an intent to make a contemporaneous transfer.

Further, even if relevant, the extrinsic evidence in the record does not establish that the Poraths intended for the 1987 agreement to effectuate a contemporaneous transfer of Mr. Porath's interest in the Brighton property to Mrs. Porath. It is true that Mrs. Porath testified that she transferred $65,000.00 to Mr. Porath, which he used to pay U.S. Computer, and which she viewed as payment for his share of the home. Mrs. Porath also testified that she took over maintaining the home and paying all of the bills related to the home after signing the agreement. However, Mrs. Porath also acknowledged that she paid some of the bills related to the Brighton property and made maintenance decisions regarding the property before the 1987 agreement was signed, that the $65,000.00 came from a joint account shared by the couple, and that Mr. Porath was the one who actually wrote the checks to U.S. Computer which totaled $65,000.00. It is also the case that not all of the bills were immediately converted to Mrs. Porath's name. Even more tellingly, in a letter to the IRS, Mr. Porath referred to the 1987 agreement as creating an "option" which Mrs. Porath held and then exercised in late December 1990 when she "directed that, where applicable, the house, cars, etc. be legally recorded in her name free and clear." Indeed, in a letter to the IRS, Mr. Porath referred to the December 1990 through January 1991 efforts to record the quitclaim deed as "the residence transaction," suggesting that he viewed the recording of the deed as effectuating the transfer of his interest in the property to Mrs. Porath.

Given that the terms of the 1987 agreement do not suggest a present intent to convey Mr. Porath's interest in the Brighton property, and the fact that even if an ambiguity in the terms of the agreement were found, the extrinsic evidence does not establish an intent to contemporaneously convey Mr. Porath's interest, the Poraths have failed to establish that Mr. Porath transferred his interest in the Brighton property to Mrs. Porath upon the signing of the 1987 agreement. Accordingly, we now consider whether the 1991 quitclaim deed was sufficient to transfer Mr. Porath's interest in the property.

The 1991 quitclaim deed was drafted and signed by Mr. Porath's attorney Robert Litt, signed by Mr. Porath, and signed by a notary public on January 25, 1991. The deed describes the Brighton property, recites that consideration of $1.00 was received, and notes that the quitclaim transfer is exempt from the state real estate transfer tax under Michigan Compiled Laws § 207.505(a). The quitclaim deed was recorded by the Register of Deeds in Livingston County on January 31, 1991. The deed satisfies the statutory requirements set forth in Michigan Compiled Laws § 565.1 and demonstrates the necessary present intent to convey Mr. Porath's interest in the property. *See Haasjes v. Woldring*, 158 N.W.2d 777, 777–78 (Mich. Ct. App. 1968). Thus, the 1991 deed accomplished what the 1987 agreement failed to do: it transferred Mr. Porath's one-half interest in the Brighton property to Mrs. Porath.

IV.

To show that the federal tax lien attached to Mr. Porath's interest in the Brighton property, the government must show that he transferred it to Mrs. Porath fraudulently. Where a taxpayer has

allegedly fraudulently transferred his property prior to the filing of federal tax liens, transferee liability is determined by the applicable state fraudulent conveyance laws. *United States v. Westley*, 7 F. App'x 393, 399–400 (6th Cir. 2001); *see Comm'r v. Stern*, 357 U.S. 39, 45 (1958) (holding that state law governs the existence and extent of liability when the government seeks to recover a tax deficiency via judgment against the taxpayer's transferee). At the time of the 1991 transfer of the Brighton property, Michigan's Uniform Fraudulent Conveyance Act, Mich. Comp. Laws § 566.11 *et seq.*, provided the relevant state statutory law.[3] A creditor may have a fraudulent conveyance set aside "to the extent necessary to satisfy [its] claim." Mich. Comp. Laws § 566.19 (1991). The IRS is a "creditor" under the terms of the Michigan Act. *See id.* § 566.11 (defining creditor as a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent"); *United States v. Campbell*, 963 F.2d 373, 1992 WL 107192, at *1 (6th Cir. 1992) (table) (affirming a district court judgment which set aside a transfer of property as fraudulent and treated the IRS as a creditor); *United States v. Berman*, 884 F.2d 916, 921–22 (6th Cir. 1989). Under the applicable fraudulent conveyance laws in effect at the time of the 1991 transfer, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Mich. Comp. Laws § 566.14 (1991).

---

[3]In 1998, Michigan adopted the Uniform Fraudulent Transfer Act, repealing the prior state statutory provisions. *See In re Hurtado*, 342 F.3d 528, 532 n.1 (6th Cir. 2003). However, under both the prior statutory provisions (the Michigan Uniform Fraudulent Conveyance Act) and the Uniform Fraudulent Transfer Act, conveyances made with actual intent to defraud creditors and conveyances made by an insolvent debtor without the receipt of reasonably equivalent value in exchange are fraudulent. *See id.*

Additionally, "[e]very conveyance made and every obligation incurred with actual intent . . . to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." *Id.* § 566.17. Michigan courts look for certain "badges of fraud"—surrounding circumstances that usually accompany an actual intent to hinder, delay, or defraud creditors—in order to determine if an actual intent to defraud creditors may be inferred. *See Farrell v. Paulus*, 15 N.W.2d 700, 704 (Mich. 1944). Under Michigan's Uniform Fraudulent Conveyance Act, a court can consider badges of fraud including: a lack of consideration for the conveyance; a close relationship between transferor and transferee; pending or threatened litigation; the transferor's financial difficulties; and the "retention of the possession, control, or benefit of the property by the transferor." *See Coleman-Nichols v. Tixon Corp.*, 513 N.W.2d 441, 449 (Mich. Ct. App. 1994). "These badges of fraud are not conclusive evidence, but may be strong or weak depending upon their nature and number occurring in the same case." *Id.*

The Poraths argue that the transfer of Mr. Porath's interest in the Brighton home to Mrs. Porath does not carry the badges of fraud. They claim that the district court erred in finding their explanation for why they entered into the 1991 quitclaim deed "unconvincing" and in finding that Mr. Porath was conscious of his potential tax liability at the time he entered into the quitclaim deed. The Poraths further contend that the district court's determination that the 1991 quitclaim deed evidenced an actual intent to hinder, delay, or defraud creditors was based upon an "improper and misplaced analysis" of the trial testimony. The Poraths also argue, based on their contention that the

1987 agreement effectively transferred Mr. Porath's interest in the property, that the 1991 deed "simply memorialized the valid conveyance that had occurred much earlier . . . ."

As noted above, although the Poraths signed the postnuptial agreement in 1987, Mr. Porath's interest in the house was not transferred by the signing of the agreement and instead was transferred by operation of the quitclaim deed filed in January 1991. Thus, in order to determine whether the transfer of Mr. Porath's interest in the Brighton property was a fraudulent conveyance intended to defraud present or future creditors, it is necessary to focus on the events surrounding the recording of the 1991 deed. By at least late 1989, Mr. Porath was aware that U.S. Computer had failed to pay its employment taxes. Mr. Porath admitted that after he learned about the unpaid taxes they were a "major concern." An IRS officer interviewed Mr. Porath in February 1990 regarding the trust fund penalty proceeding investigation, and a certified public accountant represented Mr. Porath in the penalty proceeding, filing a protest on his behalf. That Mr. Porath was fully aware of the pending IRS investigation prior to the transfer is a strong indication of fraud. *See Coleman-Nichols*, 513 N.W.2d at 449.

The 1991 transfer of Mr. Porath's interest carries several of the badges of fraud, suggesting that it was reasonable for the district court to infer an actual intent to hinder, delay, or defraud creditors. Although consideration was paid for the transfer, as husband and wife the Poraths have a "close relationship between transferor and transferee." *Id.* Further, in a letter to the Cincinnati IRS office dated December 9, 1991, Mr. Porath stated that he was unable to pay the $67,277.17 requested in the notice of intent to levy. Mr. Porath explained that he withdrew his IRA a year and a half

earlier (approximately June 1990) and had no more personal assets remaining: "[n]ow I have nothing—absolutely no assets—no cash—no property—no car—no securities—no bank account." The letter indicates that by June 1990 Mr. Porath was experiencing financial difficulties, another badge of fraud. *See id.* Mr. Porath was also aware of the potential for an IRS trust fund penalty assessment by December 1990 when he stated that he called Litt to ask whether it was a problem that the couple was running their commodities business out of the house, and he was also aware that U.S. Computer had not paid employment taxes. Both Mr. and Mrs. Porath testified that after recording the deed, Mr. Porath remained in, had unlimited use of, and was not required to pay rent for, the home; therefore, he continued to retain the "benefit of the property," which again is a badge of fraud under the case law. *Id.*

The district court did not clearly err in rejecting the Poraths' explanation for recording the deed in 1991. Although the Poraths testified that they decided to record the deed in 1991 because of their concerns about conducting a commodities trading business out of the home, given the timing of their decision and the admitted knowledge of Mr. Porath regarding the IRS trust fund investigation and U.S. Computer's tax liability, it was not clearly erroneous for the district court to have found the Poraths' proffered justification for their decision "unconvincing" and to find that the transfer was effectuated in order to place the property out of reach of creditors, including the IRS.

V.

For the foregoing reasons, we affirm the judgment of the district court.